J-A02004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.W., A MINOR CHILD | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.W., FATHER | : : : : : : | |
| | : | No. 899 WDA 2021 |

Appeal from the Order Entered June 14, 2021
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-20-0700

BEFORE: OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: APRIL 11, 2022**

Appellant, E.W. (Father), appeals from an order entered on June 14, 2021 in the Orphans' Court Division of the Court of Common Pleas of Washington that involuntarily terminated Father's parental rights to A.W. (Child), a male born on April 4, 2018. We affirm.

On August 11, 2020, the Washington County Children and Youth Social Service Agency (Agency) filed a petition seeking involuntary termination of the parental rights of Father and Child's biological mother. The Agency's petition alleged multiple grounds for termination pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b).

A hearing on the Agency's petition commenced before the trial court on January 20, 2021. Before the hearing on the Agency's petition began, Child's

_____

[*] Retired Senior Judge assigned to the Superior Court.

biological mother voluntarily consented to termination of her parental rights to Child. Notwithstanding voluntary termination of her parental rights, Child's biological mother testified as a witness at the termination proceedings, which continued for two additional days on January 27, 2021 and February 19, 2021. The trial court, in its opinion filed under Pa.R.A.P. 1925(a), compiled a thorough summary of the testimony and evidence introduced at the hearing on the Agency's petition, which we now adopt. **See** Trial Court Opinion, 6/14/21, at 2-34.

Following the conclusion of the proceedings, Father and the Agency prepared and submitted proposed findings of fact and conclusions of law. On June 14, 2021, the trial court entered an order and opinion terminating Father's parental rights to Child. **See** Trial Court Opinion and Order, 6/14/21. Thereafter, Father, on July 14, 2021, filed a timely notice of appeal together with his concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On August 19, 2021, the trial court issued its Rule 1925(a) opinion, adopting its prior opinion of June 14, 2021 as its statement of reasons for termination of Father's parental rights.

In his brief, Father raises the following question for our review.

Did the trial court err in terminating Father's parental rights as [the] evidence presented did not meet the burden of clear and convincing evidence [needed] under 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8) and 23 Pa.C.S.A. §§ 2511(b)?

Father's Brief at 8.

We have carefully reviewed the certified record, the submissions of the parties, and the thorough and complete opinion of the trial court. Based upon our review, we agree with the trial court that the Agency met its burden of establishing, by clear and convincing evidence, grounds for termination pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b). Because we believe that the trial has adequately and accurately examined the issues raised by Father in this appeal, we adopt the opinion of the trial court as our own. *See* Trial Court Opinion, 6/14/21, at 1-57. As we have adopted the trial court's opinion as our own, we direct the parties to include a copy of that opinion with all future filings pertaining to the disposition of this appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2022

## IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

## ORPHANS COURT DIVISION

IN RE: )
)
ADOPTION OF: )  NO 63-20-0700
)
A. W. )
)
AKA  A. R. W. )
)
A MINOR CHILD. )

### FINAL ORDER

AND NOW, this _14th_ day of _June_____, 2020, upon due notice to the father upon the consideration of the facts set forth in an involuntary termination hearing; this Court finds that the Agency has proven by clear and convincing evidence that statutory grounds for the involuntary termination of the parental rights of ERIC L. WILLIAMS SR., exist under 23 Pa. C.S. §2511 (a) (2), (5), and (8).

This Court further finds, pursuant to §2511(b) upon primary consideration of the developmental, physical and emotional needs and welfare of the child, that termination of the parental rights of ERIC L. WILLIAMS SR., best serves the needs and welfare of the subject child.

Accordingly, it is hereby ORDERED AND DECREED that the parental rights of ERIC L. WILLIAMS SR., to the above-named child are hereby terminated forever. The custody of the minor child shall remain with the Washington County Children and Youth Social Service and the Agency may proceed with adoption of the child.

BY THE COURT

_____
Traci McDonald, Judge

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
<u>ORPHAN'S COURT DIVISION</u>

IN RE:                )

                     )

    A.W.           )    No. 63-20-0700

                     )

                     )

## <u>MEMORANDUM AND ORDER</u>

Before the Court is the Petition and Request of the Washington County Children and Youth Social Service Agency ("the Agency") for the Involuntary Termination of Parental Rights of Ashley Turney-Jackson (hereinafter "Mother") and Eric Williams (hereinafter "Father") to minor child, A.W. (hereinafter A.W. and/or "Child" and/or "Minor Child").

In the instant case, the Agency filed a Petition for Termination of Parental Rights (may be referenced as "TPR" hereinafter) on August 11, 2020 alleging multiple grounds. More specifically, the Agency alleges: (1) Parents have not had substantial contact with the Child for a significant period of time. (2) Parents have failed to complete parenting education and/or failed to demonstrate proper parenting skills. (3) Parents have demonstrated repeated and continued incapacity, abuse, neglect or refusal to provide essential parental care. (4) Parents have ongoing Agency involvement due to concerns of drug and alcohol use and domestic violence. (5) Parents have failed to reach full compliance with various Court ordered services. (6) Child has been out of parental care and in placement for over 27 months.[1] (7) Termination of parental rights serves the needs and welfare of the minor Child. The Petition filed by the Agency asserts ground for termination under Sections 2511(a)(1)(2)(5)(8) and (b).

A hearing on the Agency's petition commenced on January 20, 2021. Prior to the hearing on the Petition for Involuntary Termination, Mother requested and the Agency consented to modify the Petition to a Voluntary Termination as to Mother.[2] Despite such actions, Mother remained as an active participant in the hearing, which continued for two (2)

---

[1] As of the date of this opinion. Minor Child has now been out of parental care in excess of 36 months.
[2] See attached Copy of Mother's Exhibit I- Consent to Agency Amendment of Petition to Terminate Rights, Explanation, Relinquishment and Waiver of Parental Rights.

1

additional days of testimony on January 27, 2021 and February 19, 2021. At the conclusion of the hearing, parties were given an opportunity to submit Proposed Findings of Fact and Conclusions of Law, for which both Father and the Agency provided submissions.

The testimony elicited in the three (3) day hearing is summarized herein. In addition, for a complete evaluation of the Agency request, a comprehensive summary of the Dependency Court record was also completed.[3]

The Minor Child was born in Washington County on April 4, 2018, to Father and Mother. On April 6, 2018, the Agency obtained an Emergency Shelter Order from the Honorable Michael J. Lucas. The Shelter Petition, adopted by the Court, set forth the following facts in support of the need for dependency:

- The child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental or emotional health, or morals; a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or custodian that places the health, safety or welfare of the Child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the Child at risk;
- The child's two older siblings are dependent and placed in a kinship foster care and have been in placement since January 30, 2017. Mother has made minimal progress to get the child's older siblings back in her custody. The child's mother has not participated in mental health services or in home services as ordered previously by the court. It is unclear if the mother completed domestic violence counseling as recommended by the courts.
- Mother and Father live together with a roommate. The parents' roommate is an indicated perpetrator of physical abuse and has a criminal record.
- Both the mother and father stated that they would not sign releases of information for the Agency regarding the child, as they do not feel the child should be involved with the Agency.
- The child was born healthy but was under observation for infection due to a lack of prenatal care.
- The mother was asked to come to the agency for a drug screen on March 8, 2018 and March 28, 2018, but did not present.
- Dr. Rosenblum has recommended that the older children not be returned to mother's care due to lack of bonds.
- The father resides with the child's mother and their roommate. Father has a criminal record but nothing pertaining to children. The Agency requested that

---

[3] The Dependency Court record was entered, without objection, as an exhibit at the TPR hearing.

Mr. Williams report to the Agency for a drug screen on April 6, 2018, but he reported that he would not be able to make it due to driving to Pittsburgh to get his birth certificate so that he can update his commercial driver's license. The Agency caseworker then spoke with the hospital who stated that father was still there.

Following the Emergency Shelter Care Order, Minor Child was placed in kinship care with Julianna and Ashley Peterson, the location of placement of his half- siblings. On April 9, 2018, a Shelter Care hearing was conducted and the Agency was granted continued Shelter with the Minor Child remaining in the same placement. Mother was in agreement with the need for shelter care and Father was not present for the hearing, despite having notice.

On April 18, 2018, the Minor Child was adjudicated a dependent child. The Child's placement remained with the Petersons and the Court ordered services for both parents. Father was ordered to:

- Obtain and maintain a safe and stable living arrangement;
- Participate in parenting education through an appropriate provider and follow through with all recommendations;
- Submit to random drug and alcohol screening at the discretion of the Agency within 24 hours of the Agency requesting a test;
- Have frequent contact with the Agency;
- Sign all requested release of information forms;
- Enjoy supervised visitation with the child three times per week to be supervised by the Blueprints or the Agency.[4]

The Adjudication Order made the specific finding that the Child was dependent "as to Father" based on the following:

- At the time of [Child's] birth, Father was employed as a long haul truck driver, which requires him to be away from home for extended period of time.
- Father was aware of Mother's involvement with Washington County CYS and that her children had been removed from her care. According to Father, he and Mother have been in a relationship prior to the removal of her other children.
- Father intended for Mother to provide primary care of the Child upon his discharge from the hospital. Despite Mother not having custody of her other

---

[4] As a result of Mother's voluntary, Dependency Case information and Hearing Testimony will focus on Father from this point.

3

children, Father had no concerns with Mother providing primary care for the Minor Child.

- Father was aware that Mother received no prenatal during her pregnancy and said he could not force her to seek prenatal care.
- Father continues to reside with an indicated perpetrator of physical abuse.
- Father's testimony supports a finding [Minor Child] is without proper parental care and control, in that Father lacks the protective capacity needed to support a finding Minor Child would be safe in his care and that he is a ready, willing, and able parent.

*Recommendation for Adjudication and Disposition of April 18, 2018, adopted by Judge Lucas.*

A permanency review hearing was held on July 17, 2018. The Court found that Father had no compliance with the permanency plan and no progress in alleviating the circumstances, which necessitated the original placement. *Permanency Review Order of Judge Lucas, July 17, 2018.* The Court also made the specific finding that:

> **Mr. Williams is not available for care of Minor Child on a daily basis. He has not visited with Minor Child.** He faults the caseworker for lack of visitation. Caseworker Barrett indicated that Mr. Williams is very hostile to her and is resistant to any services or searching evaluation. **Mr. Williams did testify that he is unwilling to work with Ms. Barrett and requested a new caseworker.** Mr. Williams also questioned the efficacy of being required to do parenting by a provider who may never have parented a child.

*Id. at pages 3-4.* In the same Order, the Court to directed Father: (1) obtain and maintain a safe and stable living arrangement; (2) participate in parenting education; (3) submit to random drug and alcohol testing; (4) have frequent contact with the Agency. The Minor Child remained with the same kinship care provider, accompanied by his two half-siblings.

On November 27, 2018, a review hearing was conducted wherein Father was found to have minimal compliance and progress. **Testimony was received from a Blueprints supervisor that Mother and Father were attentive to the Minor Child during visits, but both parents required re-direction when "openly and loudly" expressing frustration with CYS. Father also testified that "he does not need services" and further indicated that "he felt like he has been treated like a 'criminal' and that he is angry. He reiterated at several points in the hearing**

4

that he had no intention of doing any services." *Permanency Review Order of Judge Lucas, November 27, 2018 at page 4 and 5.* Father indicated that he received random drug testing through his employment as an over the road truck driver and the Court gave Father the opportunity to sign releases to obtain record of these tests from his employer.[5] *Id.* Father was Ordered to: (1) maintain safe and stable housing; (2) complete parenting education classes; (3) complete random drug and alcohol testing; (4) continue to have frequent contact with the Agency. *Id. at 3.* Visitation was ordered for Father on Saturday afternoons.

The next permanency review hearing was held on March 15, 2019 before the Honorable Brandon Neuman. No decision was provided regarding compliance and/or progress during this hearing. Father was ordered to attend supervised visits twice weekly and further Ordered to: (1) maintain safe and stable housing; (2) complete an interactional with the child and psychological evaluation; (3) provide contact information to the Agency regarding kinship or other support persons for the child and parents. *Permanency Review Order of Judge Neuman, March 15, 2019.*

May 24, 2019, the next review hearing was held at which time the Minor Child was in placement for 11 months with the same kinship care providers who also provided care for the two half-siblings of the Minor Child. All Court Ordered services remained the same and Father, through counsel, indicated that counsel would no longer represent Father. The Order specifically describes, "Father, after being disruptive throughout the beginning of the hearing, stormed out of the courtroom while using foul language and making several allegations towards this Court and everyone within it." *Permanency Review Order of Judge Neuman, May 24, 2019 with specific reference at page 3.*

The Dependency case was re-assigned to a third Judge, the Undersigned, and on November 12, 2019, the next review hearing was held. Following the hearing, the Court found minimal compliance with the permanency plan with the Minor Child being in placement for 19 months. Father was Ordered to attend supervised visitation with an opportunity for expansion if such visits occurred "without event, disruption or concern" for a period of one month. Father was further Ordered to: (1) maintain safe, stable and

---

[5] The record reflects that Father never complied with this request.

5

appropriate housing; (2) follow the recommendations of Dr. Bernstein; (3) provide contact information to the Agency relating to kinship or other support persons for the child and parents; (4) complete anger management and/or conflict resolution counseling.

*Dependency Review Order of Judge McDonald, November 12, 2019.* In lieu of a progress determination, with the Minor Child being in placement for 19 months, the Court took an in-depth look at the case history and provided a detailed analysis, as follows:

> During the hearing, the court examined in detail, placement of Minor Child, services ordered for mother and father; and the Agency proceeding to a filing of a termination of parental rights petition.
>
> The Agency and GAL argue that consistent with the Adoption and Safe Families Act ("ASFA") and the Pennsylvania Juvenile Act, a TPR petition should be filed in the present matter. This position is supported by Dr. Bernstein and the CASA assigned to the case.
>
> Father, Eric Williams, through counsel, Mark Adams, and mother Ashley Turney Jackson, through counsel Jennifer Sinclair, predictably disagree with the Agency position. In addition, Mother and Father argue that they are not in need of services and argue for return of physical custody of their minor child.
>
> While this court declines to predict the outcome of any request of goal change and/or TPR, it is important to begin with the legal foundation provided for the preservation of families and prevention of children from removal from the home. But, the child's safety, health and welfare has to be of paramount concern. Wherein it is provided that if a child is in care for 15 of the most recent 22 months, absent one of three exceptions, a petition for the termination of parental rights must be filed. In the present matter, the child has been in placement 19 of the last 22 months, accordingly examination into any potential exceptions must be completed.
>
> Because this case has made its way through several Judges, to fully evaluate the circumstances, this court conducted a review of the history and record of the case, inclusive of testimony from the November 12, 2019 permanency hearing, previous orders of court, and the Dr. Bernstein psychological and interactional evaluation and report. In this review, this court evaluated both the initial requirement for adjudication, the agency actions to finalize the permanency plan, the extent of progress toward alleviating the circumstances, which necessitated the original placement and the feasibility and timeline of the plan. See: *In re A.P. 728 A.2d 375 (Pa. Super. 1999).*

6

The statutory requirements properly direct trial courts to make decisions of permanency in the best interest of a child. In making such determination, the court is directed to look towards efforts made by the Agency and the Parents in alleviating the factors that necessitated placement in first instance. In addition, the ASFA and the Juvenile Act require that if a child has been in foster care for 15 of the most recent 22 months, then the agency must petition for the termination of parental rights unless one of the three (3) specified exceptions apply: (1) the child is being cared for my a relative; (2) the agency has documented a compelling reason for determining that terminating parental rights would not be in the best interest of the child; (3) The agency has not provided, consistent with the time period, such services to the family as deemed necessary for safe return. Each of these exceptions is examined below:

The child, is not being cared for by a relative or kinship care provider.[6] Despite multiple requests from the Agency and Court Orders directing the same, father has failed and/or refused to provide names of potential kinship placement providers for Minor Child. During the initial shelter placement, father failed to appear and mother, Turney-Jackson agreed to the shelter placement with Julianna and Ashley Peterson. Father appeared in subsequent hearings on April 18, 2018, July 17, 2018, November 27, 2018, March 15, 2019, May 24, 2019, and November 12, 2019. Throughout the time periods, no alternative kinship care provider was suggested by Ms. Turney-Jackson and/or Mr. Williams. All parties were aware that the initial circumstances requiring placement involved Ms. Turney-Jackson's lack of progress in alleviating problems that necessitated placement with her two older children, in addition to her lack of prenatal care, failure to obtain and maintain mental health and domestic violence services as previously ordered by court. All parties were also aware of concerns with an indicated perpetrator living in the home with parents and the request of the agency to drug screen both parents.

Knowing such concerns, paired with the fact that father traveled out of town during the week, no steps were taken by father to recommend and/or offer alternative care providers for Minor Child, the minor child. Rather, Father reiterated that Ms. Turney-Jackson would care for the children in his absence. Recognizing, as acknowledged by Ms. Turney-Jackson, she was unable to independently care
for the minor child, the child was placed with the caregiver of his older siblings, who are Ms. Turney-Jackson's other children.

It is noteworthy that, although the record reflects that Mr. Williams suggested no family member for kinship care to the Agency and/or the Court, in his

---

[6] Kinship provider per Father. Kinship placement was placement identified by Mother and caring for Mother's then two older children.

evaluation with Dr. Eric Bernstein, Mr. Williams suggested that he potentially had an "aunt or cousin" that may assist with Minor Child, given Mr. Williams's unavailability during the week. Mr. Williams never provided specific names and/or contact information to the agency for potential follow-up purposes. Further, in the last court proceeding, Mr. Williams suggested for the first time of record that he may change his work schedule to accommodate the need for care of his child. This Court will wait for documentation evidencing such change but notes that Mr. Williams waited 19 months with his child in placement prior to considering this work modification.

The Agency has not documented a compelling reason for determining that terminating parental rights would not be in the best interest of the child. To the contrary, in the present case, the opposite is supported by the testimony, evidence and record. Testimony establishes that the minor child, has lived with the Petersons and his older half-siblings, since birth. **Dr. Bernstein opined that the minor child would have a "significant impact and sense of perceived loss" by being removed from fostercare with his siblings." Further noting that the removal is not just from the only home that Minor Child knows, but from his siblings, fostercare parents, community, and daily routine.**

When asked about the bond developed with his siblings and fostercare providers, Mr. Williams opined that, "no matter what happens, someone is going to hurt." He continued by saying, "either she (referring to Ms. Peterson) is going to hurt or I am going to hurt." The one person not mentioned by Mr. Williams was Minor Child, the minor child and how he would feel and be impacted by removal from the home of Ms. Peterson. Mr. Williams' reaction supports the testimony of Dr. Bernstein that, **Mr. Williams allows his anger to hinder his ability to progress in this case saying, "Mr. Williams sees being angry as his right.... without regard to how exhibition of his resistance and anger is impacting his ability to be with his child."**

In fact, Mr. Williams anger and resentment is what has turned many aspects of this case. As noted in court, it is understandable that Mr. Williams would have significant frustration with the Agency and the dependency court system, particularly in light of the fact that the initial circumstances necessitating placement in large part dealt with mother, Ms. Turney-Jackson. However, Mr. Williams had multiple opportunities to correct and/or alleviate some of the Agency concerns but rather than acting in the best interest of his child, he appears to have acted with anger and resentment, despite the impact it would have on his child.

The supervisor from the Blueprints visitation house testified at a November of 2018 permanency hearing that, Mr. Williams and Ms. Turney-Jackson were very attentive to the minor child during the visits she observed. However, the same

8

supervisor testified that, re-direction was needed in the house, as a result of parents openly and loudly expressing frustration with CYS. Because of these actions, and similar expressions of anger, the Blueprints visitation house ultimately refused to permit Mr. Williams to attend visits at the location.

The final possible exception involves whether the agency has failed to provide such services to the family as deemed necessary for safe return of the child. This is not the case in the present matter. Through each of the multiple permanency review hearings, the agency has been found to provide reasonable efforts. Services and requirements were clearly defined and attainable. Nevertheless, despite services recommended, ordered, suggested and referred, the parents have refused to cooperate.

From the initial adjudication hearing on April 18, 2018, the concerns necessitating the need for placement were readily outlined. However, even at this early stage of the proceedings, Mother and Father failed to recognize a need for services and in lieu of talking [sic] any and all steps necessary to obtain return of their child, defiantly refused to comply with both Agency requests and Court orders.

Mother has failed to comply with court ordered services and father, who albeit was not initially the primary reason for placement, has refused and failed to complete services and cooperate and has allowed his frustration and anger to become so uncontrollable that additional services and requirements have been implemented. **To be sure, at the beginning stages of the dependency, had Mr. Williams simply agreed to be the primary support for his child, protecting against Ms. Turney-Jackson's independent care of Minor Child, taken and passed a drug test, secured his home as safe from dangers, including indicated perpetrators, and agreed to provide identifiable alternative caregivers for his son, the minor child may not have remained in placement.**

Nevertheless, the child has been in placement 19 months and no exceptions to the requirement of the agency to file a Termination of Parental Rights exist at this time. The agency should proceed with the petition, while in tandem with continuing to offer opportunities and services to Mr. Williams and Ms. Turney-Jackson that may negate the need for the same.

*Id, at pages 4-5.*

On March 3, 2020, another permanency review was conducted wherein Father was found to have no compliance with the permanency plan with the specific finding that, **"Father has failed to participate with any services court ordered during this review period.**

9

Father has also failed to visit with minor child during the review period." *Permanency Review Order of Judge McDonald, March 3, 2020, with specific reference to page 2.* Father's ordered visitation was decreased and the child remained in the home of Julianna and Ashley Peterson, as he had since his birth. *Id.* Father was ordered to: (1) maintain safe, stable and appropriate housing; (2) follow through with all recommendations of Dr. Bernstein; and (3) complete anger management and/or conflict resolution counseling. *Id.* The Order also notes that a TPR petition was not filed by the Agency due to concerns regarding Mother's marriage to a person, other than Father, at the time of the Minor Child's birth. *Id.*

With the Minor Child in placement for 26 months, a difference was identified at the next permanency review hearing on June 30, 2020. Father was found to be in moderate compliance with the permanency plan and was noted to have participated with anger management courses and maintained housing. Concern was voiced over Father's delayed and only recent compliance. Nevertheless, testimony was received as follows:

- Angela Franks, manager with Justice Works Youth Care anger management, testified that Father completed anger management sessions 9-12 with her and was compliant with services. Ms. Franks also supervised a visit with the Minor Child and Father and observed "Minor Child was hesitant at first but warmed up with the presentation of a lollipop." Ms. Franks opined that "Mr. Williams and Minor Child bonded well by the end of the visit." She also testified that Mr. Williams "has a loud personality" and noted that is simply "his personality."
- Justice Works Supervisor, Lisa Sutherland, also testified regarding Father's participation and noted that Father showed "a moderate level of anger pathology" but made significant improvement.
- Chris Bauhof of Justice Works testified regarding positive interactions and appropriate redirection during three (3) observed visits between Father and Minor Child. Mr. Bauhof was questioned regarding Father's behavior in Court versus that observed and acknowledged the difference in behaviors.
- Caseworker Ada Ezeh testified that neither parent has provided gifts, cards, letters, or other financial support to the Minor Child. Ezeh also testified that, although Father indicated that he wanted visits he failed to take advantage of virtual visits.[7] Ms. Ezeh also testified that, "prior to the last review period, Father had not visited with [The Minor Child] for more than six months. Ms. Ezeh testified that Father is "just now compliant."
- Father testified that, while he was aware of the recommended psychological testing contained within Dr. Bernstein's recommendation he did not

---

[7] Implemented resultant of COVID-19 restrictions.

10

participate. Father stated to the Court, "I'm not a nut case." **Father acknowledged his lack of visits with the Minor Child** indicating, "Now I work construction and we work six days a week." Father also acknowledged that he was aware of the former permanency review Order requirements and never requested "clarification, modification, reconsideration and/or elimination of requirements."

*Permanency Review Order of Judge McDonald, June 30, 2020.*

A Hearing on the Agency Petition for Aggravated Circumstances, as to both parents, was also held on June 30, 2020. The hearing, initially scheduled for March 19, 2020, was delayed due to COVID-19 pandemic restrictions mandated nationally, statewide, and locally. The Court issued an opinion, denying Aggravated Circumstances as to Father stating the following:

A hearing on the aggravated circumstances request filed by the Agency, previously scheduled for March 19, 2020 was delayed due to the COVID-19 pandemic. This delay provided Father with an additional two months to comply with Court ordered services. Despite such additional time, **Father failed to visit or have any substantial contact with minor child until the eve of the Permanency Review Hearing.**

**Father has not complied with requirements of the permanency plan and has consistently created new barriers and concerns with reunification.** Although father now raises concerns with clarity of such requirements, his actions are inconsistent with such approach. To be clear, throughout proceedings, Father has had legal representation and has never requested clarification and/or modification, reconsideration or elimination as to Court Orders, agency mandates or Permanency Plan requirements, until such time as the Agency's commencement of aggravated circumstances proceedings.

To be sure, during the most recent Permanency Review Hearing, **Father acknowledged his lack of compliance and his refusal to complete a psychological evaluation** stating "I refuse to do it ...'I'm not a nut case.'" While Father did enroll and participate with anger management, said participation was only ordered after the child was out of his custody in excess of 24 months and despite such glowing reports of progress, father again **created an uproar both in and out of the present court proceedings.**

Had the aggravated circumstances hearing been held in March 2020, this court would have had no question as to the granting of aggravated circumstances because of Father's lack of consistent and substantial contact with minor child for a period far in excess of 6 months. Due to the COVID-19 pandemic, and additional circumstances outside of the Agency and Court's control, Father was

11

given more time and he engaged in anger management and finally visited with Minor Child. While such actions come at a time frame later than for which this court is required to consider and certainly are not dispositive of whether the permanency goal in the present matter is appropriate, this Court denies aggravated circumstances as to Father.

Despite this finding, this court emphasizes that the minor child has been in placement in excess of 27 months and Father only recently made minimal attempts to comply with the permanency plan. In light of these findings, the Agency is directed to:
> - Schedule a follow-up psychological evaluation for father to be conducted with results submitted to this court no later than August 5, 2020.
> -immediately evaluate the appropriateness of the present permanency plan goals and file petitions consistent with such evaluations no later than August 5, 2020.

*Aggravated Circumstances Order of June 30, 2020.*

A permanency review hearing was held on August 6, 2020, however no finding was made regarding compliance and/or progress with Father. Father's supervised visits were increased and a provision was placed that supervision may be modified with "no further issues or problems." Father was ordered to complete an interactional evaluation and to participate with Minor Child's medical appointments. *Permanency Review Order of Judge McDonald, August 6, 2020.*[8]

On August 11, 2020, the Agency filed a Petition for the Involuntary Termination of Parental Rights. On October 27, 2020, the Agency received allegations that the foster placement providers, with whom the Minor Child resided since birth, were alleged to have put hot sauce in his mouth as a form of punishment. By verbal Order later confirmed, the Minor Child was placed in respite care with Father, implementing a plethora of services. The Agency filed a Motion for expedited hearing for placement of the Minor Child on November 11, 2020,

---

[8] Following the August review hearing, the Agency submitted a Motion for Clarification of the Order. The Motion was based on discovery by the Agency that, on July 29, 2020, the Washington City Police were called to Father's home for a domestic disturbance. This incident was not reported to the Agency and accordingly, the Agency did not address the issue at the review hearing. Additionally, it was noted that the Minor Child was not present at the time. Following a hearing on the Motion, with lack of details regarding the incident, the Court issued a Rule Returnable to show cause why Father's unsupervised visits should not commence. An Order of clarification was issued on September 9, 2020.

after the allegations of improper discipline were not validated. By Order dated November 23, 2020, the Child was returned to the caregiver with the need for respite having expired. Another Order dated December 4, 2020 modified Father's visitation for all visits to take place in his home.

On December 17, 2020, the final permanency review hearing was held prior to the hearing on the Agency's petition for Termination of Parental Rights. The Court deferred a determination as to compliance with the permanency plan pending results of the interactional evaluation between Father and Minor Child. At the time of the hearing, the Child had been in placement 31 months. *Permanency Review Order of Judge McDonald, December 17, 2020.* Testimony from multiple witnesses was received and can be summarized as:

Dr. Eric Bernstein, licensed psychologist-
- Previous evaluation shows Father has lack of discretion in expressing opinions in his son's presence.
  *There are concerns of child mimicking his father's behavior.
- Father and child have an existing bond and child sees father as an important figure in his life, but child will mimic father's behaviors and his recent intensity of outbursts is likely from observations of father.
- Father identifies as a stable adult, however the way he communicates his view has a certain impact on others. **Father doesn't see his role as dynamic and father has no self-awareness in how his behavior is impacting and plays a role with his son.**
- Father unwaveringly presents as a victim of the system. While he may have merit to his opinions, the way he communicates the problem is with hostile tone with staff employed by the Agency and this raises concerns.
- **Foster parents have a strong bond with Minor Child as do Minor Child and his siblings in the home of foster parents.**
- Foster parents present as stable and loving, however concern was raised by the disclosure of Cayden that hot sauce on the tongue of Minor Child is utilized as discipline. This matter was investigated and closed by Beaver County Children and Youth Services.

Kendra Toseki- Justice Works Youthcare
- Provides services to father through Justcare for **book-ended supervision** and with STOP services.
- Notes no concerns throughout period of working with Father, noting that all reports are positive, Minor Child is comfortable in the house, no concerns are reported for safety and **father and child interact appropriately.**

- She has received no reports of aggressive activity and father is very cooperative with Justice Works service providers.
- Present in the home with father, Sunday, Monday and Wednesday and then in October of 2020 providing STOP services, indicating that Justice Works objective is to be sure all needs of child are met and father has the capacity to care for the child.
- Observed father and child a minimum of five (5) hours per week. Also made two (2) unannounced visits.
- Father's work schedule created some initial barriers to unannounced [sic]visits.
- Noted that Minor Child was always fully and properly clothed and using "potty" while in the care of Mr. Williams.
- Reported to Supervisor incident of marks identified on Minor Child during visit with Father. Markings were later observed by doctors at Children's Hospital of Pittsburgh with no concerns for abuse.
- Reports a "strong bond with playful banter between father and Minor Child, detailing that Minor Child is settled normally in the home and comfortable in his surroundings.
- Details child saying, "My daddy," while holding onto father, noting, "as if I was there to take him."

Ashley Blake- Casework Supervisor
- Childline report regarding foster parents and hot sauce was investigated by Beaver County Children and Youth and determined to be a misunderstanding. Foster parents said Minor Child experienced hot sauce on some chicken and didn't like it. Foster mothers in further warnings to child would say, "bad taste" or "hot sauce" when he would get in trouble. The case was invalidated by Beaver County.
- Aware of the report of marks on Minor Child while with Father. Photos were taken but the lines and marks had faded. The child was taken to Children's Hospital and examined.

*Id.*

Resultant of the many twists and turns of this case, the volume of providers, several Judges reviewing the matter, and the extensive time in which the Child was in placement, the case history must be evaluated in conjunction with the testimony and evidence provided at the hearing on the TPR. Counsel for Father and the Agency provided Findings of Fact and Conclusions of Law, which were also reviewed in this Court's evaluation of the Agency request. A summary of the TPR testimony reveals the following:

14

<u>Dr. Eric Bernstein</u>, recognized as an expert in psychology and forensic psychology, testified:

- Dr. Bernstein conducted a mental health and bonding assessment of Mother, Father and Minor Child in April and May 2019. *Hearing Transcript, Vol. 1, Pg. 19.* (Hereinafter "H.T."). At that time, Father expressed a feeling of resentment toward CYS and voiced his intent not to comply with services. *H.T., Vol. 1, Pg. 27.*
- Father expressed that he trusted Ashley Turney as a capable parent, whom he believed should not require supervised visitation. *H.T., Vol. 1, Pg. 27.*
- Father acknowledged prior drug usage approximately 13 years prior. *H.T., Vol. 1, Pg. 28.*
- Father refused to comply with Dr. Bernstein's request for psychological testing. *H.T., Vol. 1, Pg. 28.*
- During the bonding assessment, Minor Child appeared as meek and despondent, presented with a frown, and appeared on the brink of tears. *H.T., Vol. 1, Pg. 29.*
- Father made an effort to engage with his son and shifted his anger to a "more enthusiastic and excitable disposition" taking his son into his arms with cheer. *H.T., Vol. 1, Pgs. 28-29.*
- Minor Child was crying at the end of the interactional evaluation with Father. *H.T., Vol. 1, Pg. 29.*
- Dr. Bernstein performed a bonding assessment between Minor Child and his caregivers, Julianna and Ashley Peterson, and his half-siblings Anessa and Cayden, on September 19, 2019. *H.T., Vol. 1, Pg. 30.*
- Minor Child cried when his half-siblings, Anessa and Cayden, exited the office and quickly recovered as soon as they returned. *H.T., Vol. 1, Pg. 32.*
- In evaluating the sibling bond, Dr. Bernstein testified,
  "the measure of the bond of a relationship is more than just the observation of the interaction alone, but is reflected in the level of investment by the caregivers, their consistency to establish trust, the stability of the environment itself, and of course, the quality of care provided. *H.T., Vol. 1, Pg. 32-33.*
- Dr. Bernstein testified that Father did not take advantage of all court ordered visitation. Father never visited on Mondays, and instead visited on Fridays from 3:00 until 10:00 p.m., only 10 to 15 percent of the allowed time. *H.T., Vol. 1, Pg. 34.*
- Dr. Bernstein testified, "[F]or younger children, especially nonverbal children, who are in the minds of development of their brain and development in all respects, really, having a sense of connection and constant and predictable access to the parents is paramount for them to be able to make a healthy connection. Where there is inconsistency or unpredictability or sporadic contact, it compromises the quality of that bond. That is, the child comes to accept that this person is not reliable, or somebody upon whom they can depend for their needs, and they become a less significant factor in their lives." *H.T., Vol. 1, Pg. 34.*
- Dr. Bernstein did not feel termination of parental rights would detrimentally impact Minor Child's well-being. After the bonding assessment in September 2019, Dr. Bernstein recommended the court move forward with termination of both parents'

right, and for the foster parents to be considered as an adoptive resource. *H.T., Vol. 1, Pg. 35.*

- Dr. Bernstein testified that he received information from CASA volunteer, Ms. Osowski, indicating that all criteria had been met for Father's home and it was safe and appropriate. H.T., Vol. 1, Pg. 39

- Father voiced frustration in attending the assessments, stating, "I feel it is a waste of time coming here. Nothing is wrong with me. I won't be treated like a common criminal. *H.T., Vol. 1, Pg. 40.*

- In his testimony, Bernstein described Father voicing with "intensity and volume" his frustration with CYS, while in front of the Minor Child. *H.T., Vol. 1, Pg. 42.*

- Dr. Bernstein testified that, "every parent may at one point in time have a gaffe, or say something that they probably shouldn't say in front of a child. And more often than not, again, in general, that is not going to emotionally scar a child. This issue, however, is when that is conducted on a repeated basis, and the child comes to accept that that is the message coming from that adult, whom they revere.... When the child is repeatedly exposed to openly expressed disdain for the Agency, for the system; and the father's openly claiming to have been discriminated against, the child is likely to hear the underlying aggression and/or anger behind that. Maybe not so much to process the information, but certainly the intensity, the gesticulations, the mannerisms, the behavior, and accept that as normal and expect it . *H.T., Vol. 1, Pg. 44.*

- Dr. Bernstein testified that, over time, Minor Child will model and mimic his father's behaviors of hostility and outbursts. This was supported during the bonding assessment between the Peterson placement family and Minor Child when the Petersons told Dr. Bernstein that Minor Child was mimicking his Father's outbursts and displayed aggressive behaviors towards them and his siblings. This was observed by the doctor during the assessment. *H.T., Vol. 1, Pgs. 45-46 and 158.*

- During his evaluation, Dr. Bernstein witnessed the Minor Child, "struggle with self-control and his behavior and even despite redirection." H.T., Vol. 1, Pgs. 45, 159.

- Dr. Bernstein testified that Minor Child has been raised with Cayden and Anessa, he embraces them in his day-to-day environment, they are part of his world that he understands and experiences, and which he has come to accept as his family. *H.T., Vol. 1, Pg. 47.*

- Dr. Bernstein conducted a mental health evaluation of Father on December 14, 2020. *H.T., Vol. 1, Pg. 49.* From which Dr. Bernstein opined that Father's position was consistent with his position in April 2019, that he's been a victim of the system, a victim of discrimination, and that he's entitled to have his son in his care. *Id.*

- During the December 2020 evaluation, Father disclosed that he had been in a 28-day drug and alcohol rehabilitation facility, information not disclosed in the earlier evaluation. *H.T., Vol. 1, Pg. 51.*

- Dr. Bernstein testified that when answering relatively benign questions, Father provided vague and less than helpful responses that really led to more questions than he provided answers for. [Transcript Vol. 1, Page 52].

16

- Father reported that he had caused a "few stitches" in response to whether he's ever caused serious injury to others, acknowledging a knife incident. *H.T., Vol. 1, Pg. 53.* In addition, although Father reported that he had never been served with a Protection from Abuse ("PFA"), a copy of PFA naming Father as the Defendant was provided. *H.T., Vol. 1, Pg. 51.*
- Dr. Bernstein testified that Father presents with an oppositional and defiant nature. He has a history of criminal activity, legal difficulties, a history of questionable aggression, threatening behavior to the Agencies, and a history of addiction. Finding these constant themes rise to level of concern for Father's psychological disposition. *H.T., Vol 1, Pg. 55.*
- Dr. Bernstein testified that he never doubted him as a loving Father. *H.T., Vol.1, Pg. 69.* And further testified that he could not identify a safety concern within the visitation logs or through the evaluation of Dr. Crabtree. *H.T., Vol. 1, Pg. 95.*
- In response to cross examination, Dr. Bernstein acknowledged that Father "can be capable, and is capable, of being loving and giving, the capacity to provide" for the Minor Child. *H.T., Vol. 1, Pg. 112.*
- Dr. Bernstein testified, "The issue with [Father] is the way in which he communicates those opinions without any hesitation or limits in his son's presence. And the intensity, the volatility, and the hatefulness that is behind his communication is the issue. So it's the vulgarity, it's the hatred, it's the threatening remarks, that is the problem. He can be angry at whatever the situation may be, but it's how he conveys it that is the problem..." *H.T., Vol. 1, Pg. 130.*
- Dr. Bernstein testified based upon his observation, Father has not internalized what he would have learned in anger management. Father, "has consistently conveyed that he has never had an anger problem, that he's never been violent towards women. So his position of "innocence" to an extent precludes him from identifying as part of that group." *H.T., Vol. 1, Pg. 164.* Stating that he did not get the sense from Father that he made efforts to change because he saw no need to change. *Id.*
- Father has never conveyed any understanding that his behaviors that he has in front of the child would have any impact on the child. *H.T., Vol. 1, Pg. 164.*
- Dr. Bernstein also testified regarding a mental health assessment that he conducted on Norma Welsh, Father's current paramour. *H.T., Vol. 1, Pg. 55.*
- While collateral testimony and evidence was unclear as to whether Father and Ms. Welsh currently co-habitat, Ms. Welsh reported to Dr. Bernstein that she was in an intact, healthy and stable relationship with Father, but she moved to a different residence as a result of being harassed by Mother. *H.T., Vol. 1, Pg. 57.*
- Ms. Welsh detailed her history of being a victim of physical and emotional domestic violence and described her first husband (Not Father) as "pretty cruel, over-controlling, and who fractured my whole body twice. *H.T., Vol. 1, Pg. 61.*
- Dr. Bernstein opined that if the Minor Child was placed with Father, he would have concerns over Ms. Welsh's protective capacity for the Child, worrying that Ms. Welsh would not contact appropriate authorities in the event the Child was at a risk of harm or if his safety was compromised. *H.T., Vol. 1, Pg. 64.*

17

- Dr. Bernstein opined that foster parents meet the needs and welfare of Minor Child, and that Father's parental rights should be terminated. *H.T., Vol. 1, Pg. 64.*
- Dr. Bernstein testified that Permanency Legal Custodianship is not a viable goal in this case. Going further to describe situations where PLC is appropriate as being where there "is a modicum of co-parenting communication and/or relationship between the providers of care and the parent in question, and a level of shared respect and openness." *H.T., Vol. 1, Pg. 126.* Noting as an additional factor, that a parent is working toward putting themselves in position of eventually parenting the child, but needs a bit more time to establish whatever goal they are working on. *Id.*
- When pressed on the issue of PLC, Dr. Bernstein stated, "I know you've made mention about [Father's] progress, there are areas in which I have not seen progress that gives me the impression that he's going to continue having certain outbursts of behavior. And he's never shown discretion in conveying his upset and frustrations in this child's presence. I have not seen progress [sic] that respect. His personality is such that I can't help but question if he's going to continue having difficulties managing his frustration, as exemplified by reports I've received of shouting of profanity and threatening behavior and insults to others, and the blaming of others for his respective difficulties. *H.T., Vol. 1, Pgs. 126-127.*
- Dr. Bernstein opined that terminating Father's rights will have some measure of negative effect upon Minor Child, that he will experience some separation or loss. But that loss will not be so overwhelming that it can't otherwise be compensated for, should the Court move forward and support the adoption process. *H.T., Vol. 1, Pg. 65*
- Testimony was elicited from Dr. Bernstein that the Child and Father have an existing bond. Dr. Bernstein stated, the Child recognizes him and enjoys Father's company when he isn't working. However, the doctor understood Ms. Welsh as the main caregiver during Father's absence.
- Dr. Bernstein testified that Father shows the necessary caretaking ability, but his concerns are on how Father models and "that is an aspect of parenting." *H.T., Vol. 1, Pg. 93.*
- Dr. Bernstein testified the sibling bond is absolutely significant, and if that were to be compromised it could have a negative impact on Child in the short term and long term. *H.T., Vol. 1, Pg. 172.* Finding that removing the Minor Child from the caregivers home would be tantamount to compromising and negatively impacting his identify and his world, and Dr. Bernstein opined it would be traumatic to remove him from that environment, potentially having long-term implications with respect to identify, emotional regulation, cognitive development, social skills, and relationships. *H.T., Vol. 1, Pg. 174.*
- Dr. Bernstein testified that in his professional opinion, termination of father's parental rights would best serve the needs and welfare of Minor Child. *H.T., Vol. 1, Pg. 66-67.*
- Upon further questioning regarding whether Father should have continued contact if termination was granted, Dr. Bernstein opined that, it was a complicated question and should be based on "the level of predictability, that is, whatever is established it not be sporadic or inconsistent." Testifying further, that there should also be some

18

contingency upon [Father] and his behavior.... in response to the reported outbursts related to Father's disapproval of their sexual orientation or identity. Noting that, "his opinion should be left outside of their co-parenting relationship and it should be focused just upon [the Minor Child]. *H.T., Vol. 1, pgs. 118-119.*

- Dr. Bernstein testified that he observed more of a bond between the Minor Child and Father and attributed this to more time.
- Dr. Bernstein also testified that he saw no progress in Father showing discretion in restraining his upset in the Child's presence. Further, Dr. Bernstein noted that Father's current paramour, Ms. Welsh complicated matters.
- When evaluating the potential return to Father, Dr. Bernstein testified that the Minor Child's sibling relationships should not be underestimated, commenting that this was concerning with the level of tension with Father and the fosterparents.
- Dr. Bernstein testified that the Minor Child looks to his foster mom as his psychological parent that he looks to for everyday needs and to remove the child is tantamount to impacting his identity and his world.
- Finally, Dr. Bernstein testified that he is concerned that Father cannot meet the Child's psychological needs.

Ashley Blake, Caseworker Supervisor- Washington County Children and Youth Social Services, Testified:

- Casework supervisor with the case since October 2019. *H.T., Vol. 1, Pg. 188.*
- Ms. Blake testified that when Case commenced with Court Activity, the Agency had concerns over Father's protective capacity due to his inability to recognize issues of the biological Mother caring for the Child considering her mental health issues. The Agency was also concerned regarding parents living with an adjudicated perpetrator.
- Ms. Blake testified that the Child has been a Dependent Child for 33 months and is in kinship placement with Julianna Peterson, a pre-adoptive resource. *H.T., Vol. 1, Pgs. 190-192.*
- Upon review of the history of Court Ordered conditions and services, Ms. Blake testified that Father had appropriate housing, noting that since the December 2020 review hearing, Father changed his address to an apartment in Canonsburg. *H.T., Vol. 1, Pg. 202.*
- Ms. Blake later testified that, Father recently moved into his current home and "is indicating that he is going to move into a larger apartment in the near future, so is his house safe, stable, I don't know if we can assess it to be stable quite yet." *H.T., Vol. 1, Pg. 246.*
- Blake testified that Father reported he was no longer in a relationship with Norma Welsh. *Id.*
- Ms. Blake testified that the Agency referred Father for parenting education in April of 2018, but he refused to participate. He was re-referred in July of 2018, again refused, and consistently refused throughout the dependency case. *H.T., Vol. 1, Pg. 203.*
- Blake testified the in March of 2019, Father was no longer ordered to participate in parenting education. *Id.*

19

- Blake testified that Father was ordered to participate in random drug and alcohol screenings when the Minor Child was adjudicated Dependent and Father did not comply. Blake indicated that Father participated, "in one drug test, which wasn't random, on April 19, 2018, at which time he was negative for all substances." *H.T., Vol. 1, Pgs. 203-204.* Father refused to participate with additional drug tests. *Id.*
- Ms. Blake testified that, when anger management was initially ordered, Father was working out of state and he was sent letters identifying places that he could participate with services. Father did not initially comply, however, in March of 2020, Father began anger management services with Justice Works and completed the programming on June 13, 2020. *H.T., Vol. 1, pgs. 204-205.*
- Ms. Blake testified that, upon review of the Court orders, Father was "causing uproars" in and out of the courtroom. *H.T., Vol. 1, pg. 206.* Further detailing a personal interaction with Father on October 1, 2020, following his completion of anger management. Blake described going, unannounced, to Father's home to confirm his residence and Father, "[a]sked who it was and came outside. He stood maybe six inches from myself and the caseworker proceeded to scream, cuss, yell profanities, racial sluts (sic), said that we were harassing him." Father eventually permitted Blake's entry, but she further testified that, "while we were asking about, you know, where does he keep his clothes, those type of things, he threw clothes and other items around the bedroom. And then proceeded to yell that we needed to get the eff out of his house. After we left the home, he proceeded to follow us outside and continued to yell and scream profanities, those types of things." *H.T., Vol. 1, pgs. 206-207.*
- Blake acknowledged that Father's actions of October 1, 2020, gave her concern that Father had not internalized the skills taught to him in anger management. *H.T., Vol. 1, pg. 207.*
- When asked to provide a history of Father's visits with Minor Child, Ms. Blake testified:
  - From adjudication in April of 2018 until July of 2018, Father did not participate in visitation.
  - From July of 2018 through November of 2018, Father participated in 14 out of 17 visits.
  - From November 2018- March 2019, Father participated in 9 out of 10 visits with Minor Child.
  - From March 2019- April 2019, Father visited regularly at the Blueprints visitation house.
  - On April 20, 2019, Father was "removed from the Blueprints visitation house schedule, after he had made threats to staff and his visits were then change to the Agency for supervision."
  - From April 2019- November 2019, Father was inconsistent with visits, but a specific number of attendance and/or absences was not maintained.
  - From July 26, 2019 until June 30, 2020, Father did not participate in any visits with the Minor Child.
  - From June 30, 2020 until the present date, Father has been consistent with his visitation. *H.T., Vol.1, pgs. 208-209.*

- o Ms. Blake testified that Agency COVID visitation procedures were implemented by the Agency from March 14, 2020 until June 6, 2020. During this time, Father was contacted, on at least three (3) occasions, with an offering of virtual visitation and he declined any offers. *Id.*
- Ms. Blake indicated that the Agency filed a petition for Aggravated Circumstances and Father began engaging with visitation and participating with services immediately prior to the hearing on Aggravated Circumstance. *H.T., Vol. 1, pgs. 210-211.*
- Blake testified that the highest level of compliance and progress Father achieved throughout the dependency case was moderate, on two (2) separate occasions. *Id.*
- Blake testified that in the six (6) months and twelve (12) months preceding the filing of the Agency's petition for termination of parental rights on August 11, 2020, Father did not remedy the circumstances leading to dependency of the Minor Child. *H.T., Vol. 1, pg. 218.*
- Ms. Blake testified that the Agency position is that termination of Father's parental rights is in the best interest of the Minor Child. *H.T., Vol. 1, pg. 219.*
- Father only participated in Child's medical appointments after being Court Ordered to participate. *H.T., Vol. 1, pg. 218.*
- Ms. Blake testified that Father, "has made progress in his anger management," but noted concerns with his ongoing behaviors and the impact they have on the Minor Child. *H.T., Vol. 1, pg. 219.*
- Blake testified that Father has completed an interactional evaluation, has not provided kinship information, and has not missed visitation since June of 2020. Additionally, Blake testified that he Agency has "no concerns with his parenting" and no concerns with Father and his use of illicit substances. *H.T., Vol. 1, pg. 222,228, 230.*
- Ms. Blake testified that although Father never participated with parenting education, after May 24, 2019, the Court Orders in the Dependency Review case never contained the requirement of parenting education. *H.T., Vol. 1, pg. 237.*
- Ms. Blake also testified that all of Minor Child's "basic needs were met while he was in the care of Mr. Williams." *H.T., Vol.1, pg. 241.*
- When responding to questions regarding Father's delayed engagement with the Minor Child's medical appointments due to Father's inability to get along with the Foster Parents, Ms. Blake acknowledged, "it is a parent's duty to overcome any obstacles that may prevent reunification, whether they are real or perceived." *H.T., Vol. 1, Pg. 247.*

Lori Huey- Blueprints Foster care Caseworker

- Ms. Huey has been the foster care caseworker with the Minor Child and Father since the day the Minor Child was placed. *H.T., Vol. 2, pg. 282.*
- Ms. Huey testified regarding an incident she observed with Father in September of 2020 during a time when she had recently arrived with the Minor Child and stood with him on the sidewalk waiting for other providers to arrive. *H.T., Vol. 2, pg. 284.*
- Specifically, Ms. Huey testified that an employee from Justice Works arrived shortly after and she heard a gentleman tell the worker not to park where she was. Ms. Huey

said the worker came over and they stood and talked for a couple of minutes. Ms. Huey then testified Father came to get the Child and she went to her car. She watched Father come across the street, and thinking he was coming to talk to her, she put her window down. She then testified that, "it turns out, he wasn't coming to talk to me. He was yelling at the neighbor, about telling her not to park there." *H.T., Vol. 2, pg. 284.*

- Ms. Huey testified that Father yelled, "You can park wherever the eff you want, it's none of his business where you park." She also heard Father state, "I know exactly who said that shit. It's that effing N-word, the bald-headed black guy." *H.T., Vol. 2, Pg. 284.*
- Ms. Huey testified that Father then walked over to the Justice Works worker and said, You can park wherever the eff you want, you're here to work. All he does is sit on his effing black ass all the day." Huey stated that Father then "scooped up Minor Child and went into the house." *H.T., Vol. 2, Pg. 285.*
- Ms. Huey acknowledged upon cross- examination that she has heard "a member of the black community refer to another member of the black community as the N-work, even in a friendly connotation." *H.T., Vol. 2, Pg. 289.* However, Huey further testified that during her observation in September of 2020, Father was loud, very angry, pointing his finger and not using a friendly tone. *H.T., Vol. 2, Pg. 290.*

Liz Knapp, Children and Youth Social Service Agency Caseworker:

- Caseworker assigned in the matter since June of 2020. *H.T., Vol. 2, Pg. 301.*
- Ms. Knapp testified that when she was assigned the case with Father, he had just finished his anger management. *Id.*
- Ms. Knapp testified that although Father had completed anger management, his actions against her and others established that he was not utilizing the things he learned in anger management. *H.T., Vol. 2, Pg. 341.*
- Knapp testified that a Family Group Decision Making meeting was convened in August of 2020. "Five minutes into the family's portion of the discussing the issues and concerns, we started to hear that [Father] became loud. So we did go into the room and intervene, and at that point, the group wasn't making any progress, so we stopped the meeting." *H.T., Vol. 2, Pg. 302.*
- A follow-up meeting was scheduled in October of 2020; however, Ms. Knapp testified that the meeting ended early because Father was upset that CASA was participating. The focus of discussion for the meeting was on "sibling visitation, if reunification were to happen." *Id.*
- Ms. Knapp testified that on September 30, 2020, she went to Father's home that he shared with Norma Welsh to perform a home safety check. Knapp described Father as "quite frustrated" and noted, "He did raise his voice slightly," at which point Knapp observed the Minor Child put his hands over his ears. *H.T., Vol. 2, Pg. 303.*
- Ms. Knapp testified that Ms. Welsh threatened to "film her" as she left and noted that she did see Ms. Welsh with the phone after the comment, but was unsure what she was doing. Knapp testified that as she went outside, she observed the Minor Child driving in

22

his "little remote controlled car" and Father commented, "If I was white I would have my kid back by now." *H.T., Vol. 2, Pg. 304.*

- Ms. Knapp testified that during the September 30 visit, she was unable to complete her safety check because she was alone and she became "uncomfortable" due to Father following her around and "getting loud." Accordingly, Knapp testified that she returned the next day with her supervisor, unannounced. *H.T., Vol. 2, Pg. 305.*

- Ms. Knapp testified that Father, "came down the stairs and was screaming and yelling, right close to our faces, about wanting to know why we were there; calling us names like white, effing C-word, honkies, and screamed the only reason CYS was involved in this was because of that dumb, effing, white, B-word [Mother]". *H.T., Vol. 2, Pg. 306.*

- Knapp testified that Father eventually calmed down, allowing her and her supervisor to enter the house and proceed upstairs to check his room. Knapp testified that, "at that point, he started throwing items [saying], whose effing stuff is this, whose stuff is this? And then he said, now, get the eff out of my house." *Id.*

- Ms. Knapp indicated that Father specifically told her, "You better never bring your fat A-word back to my house, ever again." *Id.*

- Ms. Knapp testified that she made another unannounced visit to Father on November 12, 2020. *H.T., Vol. 2, Pg. 306.* Ms. Knapp described Father as calm during the visit but noted that he openly, and in front of the Minor Child, discussed and cursed about CYS and CASA saying, "Eff that effing B-word Vivian." *H.T., Vol. 2, Pg. 307.* Knapp testified that Father continued by referring to the previous caseworker with "a very inappropriate name;" Knapp describing Father as calling the caseworker a "big-lipped, Aunt Jemima looking effer," and using the "N-word." *Id.* Father making these comments in close proximity to the Minor Child. *Id. and at 308.*

- Ms. Knapp testified that, "since she took over the case, June 29, 2020, [Father] had been active and involved with the case and with his child." *H.T., Vol.2, Pg. 314.*

- Ms. Knapp testified that she observed, "in her few interactions with [Father] and [Child], good parenting skills, as far as going over letters, numbers, things like that nature." *Id.*

- Ms. Knapp testified that on November 12, 2020, the Agency placed Minor Child in respite care with Father for a little over a month. *Id. through 315.*

- Ms. Knapp testified that, during the time the Minor Child was placed with Father in respite, there were no significant safety concerns with Father, but crisis services were put in place the ensure that there were no safety concerns. *H.T., Vol. 2, Pg. 315 and 335.*

- Liz Knapp testified she has not observed any safety concerns since the last review hearing. *H.T., Vol.2, Pg. 326.*

- When placed in respite care with Father, the Agency felt Father could meet the needs, emotion, psychological and physical of Minor Child. *H.T., Vol. 2, Pg. 361.* However, when the Agency placed the Child in respite with his Father, the Agency did not have Dr. Bernstein's updated opinion regarding Father's ability to meet the psychological and emotional needs of the Child. *H.T., Vol. 2, Pg. 364.*

- Liz Knapp testified that she believes Father loves his son very much.

23

- Liz Knapp testified that there are no negative reports in the visitation logs.

Vivian Osowski, Court Appointed Special Advocate:
- Testified that she has been the assigned CASA for the Minor Child since 2018. *H.T., Vol. 2, Pg. 268.*
- Ms. Osowski testified that Father has been uncooperative with her and "unhappy" with her reports. Providing further testimony that she has seen no change in Father's disposition since his completion of anger management. *Id.*
- Testified regarding a November 12, 2020 voicemail left for her by Father wherein, amongst other things, Father referred to Ms. Osowski as a "racist white bi***." Ms. Osowski testified that following Father's voicemail, she was unable to further engage with him because he would not let her into his home, including the next day when she attempted an unannounced visit. *H.T., Vol. 2, Pg. 373.*
- Ms. Osowski testified, "I think [Father] can care for his son in terms of physical needs. He has no concept of how his anger affects Minor Child. So yes, that is a huge concern. My other concern is the sibling bond, and how strong it is, [Minor Child] and his siblings. And I do not believe [Father] would be receptive to allowing [Minor Child] to continue visiting his siblings. I have that opinion because of the statements he's made in family group meetings, as well as how he has presented himself to foster parents, in terms of being combative, disrespectful, and uncooperative. *H.T., Vol. 2, pg. 374.*
- Father has told Dr. Bernstein that he hates the CASA. *Id.*
- Ms. Osowski testified that she thinks that Father can engage in a positive way with the Minor Child, including engaging in play and encouragement. *H.T., Vol. 2, pg. 389.* However, Osowski felt that Father's behaviors, specifically citing his "level of anger," use of derogatory remarks, could "very adversely affect [Minor Child] in his development. *Id.*
- Ms. Osowski testified that she has advocated for the Minor Child to be with the foster family because for a "large portion of Minor Child's life, father was not involved at all" and father only recently became involved after going months without seeing the Child. *H.T., Vol. 2, Pg. 411.*

Julianna Peterson- Foster Mother for Minor Child:
- Testified that Minor Child was placed in her care right after his birth. *H.T., Vol. 2, Pg. 426.* Minor Child lives in her home with her, her sister and Minor Child's two (2) half-siblings. *Id. and at 427.*
- Testified that Father did not visit with the Minor Child from July of 2019 until June of 2020. *H.T., Vol. 2, Pg. 427.*
- Testified that he has been consistent with his visits since June 2020. *Id.*
- Testified that she heard Father and his paramour, Ms. Welsh yelling inside their home when she went to pick up Minor Child from a visit. *H.T., Vol. 2, Pg. 428.*
- Testified that Father yelled at Minor Child when Minor Child addressed her as "Mummy." *H.T., Vol. 2, Pg. 431.* Including testimony that Minor Child acted with confusion due to the encounter. *Id.*

24

- Ms. Peterson testified that during exchanges for visitation, Father rarely talks to her, despite her efforts to attempt to talk with him. *Id.* Through further testimony, Ms. Peterson indicated that similarly, Father rarely greets Minor Child during the exchange saying, "he'll just take him from me, take him out of the car, and go into the house..... There was one particular occasion, where I got out of the car, and [Minor Child] said, 'hi daddy.' And there was no response from [Father], he just took him and put him in the car." *H.T., Vol.2, Pg. 432.*
- Ms. Peterson testified that Minor Child mimics his Father's anger, stating that Minor Child will walk around the house stomping and saying, "I'm mad, I'm mad." *Id.* [9]
- Ms. Peterson testified that Minor Child calls her mommy and has developed a relationship with her parents, calling them grandma and grandpa. *H.T., Vol. 2, Pg. 433-434.*
- Ms. Peterson testified that, throughout the time that she has cared for the Minor Child, Father has not made calls to her home to ask about Minor Child. *H.T., Vol. 2, Pg. 445.* She further testified that Father has not video chatted with Child, and has not provided gifts, cards or letters to Minor Child. *Id. and at 446.*
- Ms. Peterson testified that Father has made derogatory comments to her, including calling her a "white dyke" and referring to her as part of the "fat girls club." *H.T., Vol. 2, Pg. 449-450.*

Kendra Toseki- Justice Works Youth Care, Supervisor:
- Testified that she reviews progress notes of other employees and puts together a summary and has supervised the case since June 2020. *H.T., Vol. 3, Pgs. 480-481, 494 and 499.*
- Ms. Toseki testified that she observed one visit in October 2020, which was not designated as a supervised visit, and Minor Child appeared comfortable with her observing no safety concerns. *H.T., Vol. 3, Pgs. 489-491.*
- Ms. Toseki testified that she directly observed Father for approximately an hour and saw Father play with Minor child and assist with his toys. *H.T., Vol. 3, Pg. 492.*
- Ms. Toseki observed Minor Child saying, "Daddy, I love you."
- Ms. Toseki testified that Father is observed as having positive interaction with the Minor Child. *Id.*
- Ms. Toseki testified that Father is cooperative with Justice Works, always permitted staff to come into the home with no issues. *Id.*
- Ms. Toseki was asked about the incident involving Father swearing at a neighbor that was not documented in the Justice Works reports. Ms. Toseki testified that her staff

---

[9] Cross-reference made to Hearing Transcript, Volume 2, Pages 417-419, wherein during examination of witness Osowski, Father stood and requested to be heard, after which an extended discussion was had regarding the role of Father's behavior and Father's concern regarding racism. Father began saying, "But, here's the only thing that I have to say, I'm just a big, bad monster, right? But --- and it's all because I'm just angry and nasty." Father continued by noting, "I'm the only black one in here, and everyone's attacking me. Do you know what I'm saying?" The Presiding Judge noted that she too was African-American, however, Father continued by saying that the Judge only recently became involved in the case.

had a different recollection of the event. *H.T., Vol. 3, Pg. 497.* Further testimony established that the worker present during the incident was new with the visit being only her first or second week in the field. *H.T., Vol. 3, Pg. 504.*

Lisa *Sutherland*, Supervisor Justice Works Youthcare:

- Ms. Sutherland testified that she is a supervisor with Justice Workers Youthcare and has served in that capacity for the last 3-4 years. *H.T., Vol. 3, Pg. 506.*
- Ms. Sutherland testified that Father is good with Minor Child and she has no concerns with his parenting. *H.T., Vol.3, Pgs. 507-508.* Testifying further that both she and her staff have reported positive interactions between Father and Child. *Id.*
- Ms. Sutherland testified that Father acted politely with her staff, noting, "We actually had staff that reported that he [Father] walked them to their cars at night when they were leaving his home, because of the area that he lived in, and that they didn't feel comfortable. *H.T., Vol. 3, Pg. 508.*
- Ms. Sutherland testified that there has been an improvement with Father's anger management. *H.T., Vol. 3, Pg. 509.* Ms. Sutherland said this opinion was based on her observations of Father where, previously in Court hearings Father was "incredibly angry, and oftentimes uncontrollable." *Id.* She continued that, "you weren't able to get him to not to, and he would continue to talk over you, talk over the judge, talk to other members of the Court, whereas now, when you ask him to not say anything, or remain silent, he actually does that." *Id. and at 510.*
- Ms. Sutherland testified that with regard to Father and his anger, "there have been less outbursts in court, less outbursts in public settings, as to where he is containing himself and conducting himself better in those situations." *Id.* "You know even though he [Father] is upset, he's taking that down a degree or taking that down a notch and not going to that next level, or going to that immediate response of anger and hostility." *H.T., Vol. 3, Pg. 511.*
- Ms. Sutherland testified that Minor Child interacted naturally and normally with Father. *H.T., Vol 3, Pg. 512.* She further testified that the child would climb on his Father's lap and ask him to play with him. The Minor Child would say, "Daddy bite my ear," and Father would nuzzle up with the Child and kiss his ear. *Id.*
- Ms. Sutherland opined that Father and Child had a "normal, natural father-son bond and interaction." Sutherland observed the two eating together, playing together and doing educational activities together. *H.T., Vol. 3, Pg. 513.*
- Ms. Sutherland has not observed any problems with Father's ability to parent. *H.T., Vol. 3, Pg. 516.*
- On cross-examination, Ms. Sutherland acknowledged observing different behaviors of Father in Court, including acknowledgement of Father creating an "uproar in court" following his completion of anger management with her agency. *H.T., Vol. 3, Pg. 517.*
- Upon further cross examination, Ms. Sutherland was questioned about two distinct incidents following Father's completion of anger management, including: (1) Caseworker testimony regarding interactions with Father when she was at his home and Father was storming toward a caseworker ranting, angry, and loud while the Child

26

covered his ears; and (2) when Father reportedly was yelling at caseworkers in his home calling them "white, effing bitches" and screaming six inches from their faces. H.T., Vol. 3, Pgs. 518-519.

- In response, Ms. Sutherland testified that anger management is a continuing process and not something that can be "completely cured," that Father will have relapses, but he still has made progress. *H.T., Vol. 3, Pg. 520.*
- Ms. Sutherland testified that Father has made improvements with his anger management, but not drastic improvements. *H.T., Vol. 3, Pg. 523.*
- Despite stated concerns, Ms. Sutherland is of the opinion that Father can still work on his anger. Ms. Sutherland opines that she thinks father's anger is triggered due to his feeling that he was racially profiled by the Agency and the Courts, however, Sutherland acknowledges she has limited interaction with Father interacting with persons outside of the Agency and Court. *H.T., Vol. 3, Pgs. 529-538.*
- Ms. Sutherland supported her position of Father's ability to parent Minor Child and control his anger based on her observations, observations of her staff and the success of re-direction for Father. However, upon cross-examination, Ms. Sutherland acknowledged that if Minor Child was in Father's care and there were no court ordered supervision, there would be no one to de-escalate Father's anger. *H.T., Vol. 3, Pgs. 539-540.*

**Toni Thomas, Paternal Grandmother:**

- Ms. Thomas testified regarding her recent interactions and observations of Father and Minor Child.
- Ms. Thomas testified that Father and foster mother, "don't really communicate," saying that foster mother just "hands Minor Child over," and Father just takes him and goes. *H.T., Vol. 3, Pg. 553.*
- When asked about potential problems with Minor Child visiting with his half-siblings in the foster home if Minor Child was returned to the care of Father, Ms. Thomas testified that she didn't believe there would be any problem, but was unable to support this position with further testimony. *H.T., Vol. 3, Pg. 553-554.*
- Ms. Thomas acknowledged knowing that Minor Child was in foster care since his birth and further acknowledged only first becoming involved with the Agency case in August of 2020. *H.T., Vol. 3, Pg. 555.*
- Ms. Thomas testified that she got involved when she came back from vacation and "Eric would call and tell me what was going on, but I got involved when I came to the first hearing. And if you really want to know the truth, and the fact that I walked in the courtroom full of nothing but Caucasians. And my son was being attacked by a bunch of vicious white women. So that is why I got involved." *H.T., Vol. 3, Pg. 555-556.*
- Ms. Thomas testified that her son, Father, doesn't like the Minor Child's foster mother and her sister and further testified that she isn't "that fond of them either." *H.T., Vol. 3, Pg. 556 and 558.*

Eric Williams, Father of Minor Child:

27

- Father discussed his initial history with the Agency and the Minor Child. *H.T., Vol. 3, Pgs. 591-593.*
- Mr. Williams acknowledged that the Agency expressed concerns with the Child's Mother at the time of birth, expressed concerns with a roommate at the time of the Child's birth, and requested a drug test from Father at the time of birth. *H.T., Vol. 3, Pgs. 594-595.*
- Father testified that foster mother didn't like him because, foster mother, and "doesn't like men." *H.T., Vol. 3, Pg. 595.*
- Father testified that he would do everything in his power to be sure the Minor Child had visits with his siblings if the Child was returned to his care. *H.T., Vol. 3, Pg. 596.*
- When questioned as to why he felt racially discriminated in the case, Father testified that when the CASA worker first met him, she looked at him and "she looked right down her nose at me. She gave me that look. I'll say that look. And that look I know, because I'm black. I know when somebody you could tell by their gestures towards you, when they don't like that interracial couple stuff." *H.T., Vol. 3, Pg. 600.*
- Father testified that the incident where he was claimed to have made racially discriminatory remarks while yelling at a neighbor were misunderstood testifying, "there's no way that she heard every word I was saying, or what I was saying. I'm loud, but I'm naturally loud. I'm a big dude. But I would look like a fairy if I had a little squeaky voice." *H.T., Vol. 3, Pg. 602.*
- Father testified that his behavior was normal for the area in which he lives and he felt that he was defending the honor of the worker involved. Father stated, "Project life is a lot different than normal life. Like, project life is like being in the jungle in Africa. You're a predator or you're prey. . . . . So I walked over there, to let him know that that was going to be the last time that anybody came to visit me, that he said something to them." *H.T., Vol. 3, Pg. 604.*
- In response to questions regarding his use of racial epithets, Father testified that it is common in the black community for individuals to refer to one another as "nigga," explaining further, "its all in the spelling. If it's spelled with an A, it's okay." *H.T., Vol. 3, Pg. 606.*
- Father further explained that this conduct did not occur in the presence of the Minor Child. *Id. and at 607.*
- Father testified that he was asked by the Agency to engage in a parenting class but felt that Judge Lucas removed that requirement. Father also acknowledged that he has a drug history, but testified that that was behind him. *H.T., Vol. 3, Pg. 613.*
- Father testified that he apologized to caseworkers because he realized his behavior with them was wrong. *H.T., Vol. 3, Pg. 615.*
- When questioned regarding his feelings of racism by the Agency when his initial caseworker was African-American, Father described the worker as a "token." *H.T., Vol.3, Pgs. 615-616.* Father further illustrated that, "in the day, there was three types of niggers; there was the house nigger; there was the field nigger; and there was the dead nigger. Me, back in the day, I would have been the dead nigger. Brittany Berkley (the caseworker) would have been in the house." *Id.*

- Father testified that he loved the Minor Child and wished for him to be returned to his care. H.T., Vol. 3, Pgs. 618-617.
- Father commended foster parents for raising the Minor Child and re-asserted that he would work with the foster mother to enable Minor Child to visit his siblings if Child was returned to his care. H.T., Vol. 3, Pgs. 619-620.
- Father testified that he is able to provide all necessities to the Minor Child and noted that he was equipped to also "provide him with the mental stuff that he would need to make it in life. See, because believe it or not, [Minor Child] is black. Right now, he's light-skinned, but I'm a very dark black man, and [Minor Child] is going to become a lot darker. He'll probably be darker than both [his siblings]. He's going to be considered a black man in white America. Who's going to teach him to deal with that?" H.T., Vol. 3, Pgs. 620-621.
- Father acknowledged that although he was Court ordered to participate in parenting education; he did not participate in parenting education. H.T., Vol. 3, Pg. 626.
- Father acknowledged that he did not comply with the drug screening or parenting that was Court ordered by Judge Lucas. H.T., Vol. 3, Pgs. 627-628.
- Father testified that, despite his child being in foster care he was not doing the services and further testified, "I'm not going to do the services today." H.T., Vol. 3, Pg. 629.
- When asked if he recognized that the year he refused services his child was developing a bond with the foster family, Father testified, "That doesn't matter, it doesn't matter how long my child is in foster care, okay? They signed up to be foster parents. They know that any day, that child can be taken away from that home. The bond that is formed between a foster parent and a child does not matter. That is irrelevant." H.T., Vol. 3, Pg. 629.
- Father testified that he felt that Judge Neuman was the only fair judge that he had and noted that he wasn't a bad parent saying, "I wasn't a bad parent. I hadn't been proven to be a bad parent. And I was not going to do the bad parent steps. That would be admitting that I was a bad parent." H.T., Vol. 3, Pg. 630.
- Father acknowledge that although Judge Neuman ordered that he participate in an interactional and individual evaluation that he refused to participate. Father stated he refused because, "I didn't, at that time, I didn't. He... I was under the impression that I had to do an interaction, a psychological evaluation for what? I wasn't crazy when this started." H.T., Vol. 3, Pg. 631.
- Father also acknowledged storming out of Judge Neuman's courtroom while using foul language but explained that he was frustrated because he had fired his attorney in the middle of the proceedings and the Court was continuing with the hearing. H.T., Vol. 3, Pg. 631-632.
- Father acknowledged that he did not participate with drug testing, testifying that Judge Neuman and Judge McDonald did not order drug testing. H.T., Vol. 3, Pgs. 632-633. Father continued by stating that the Agency doesn't have the power to drug test. Father stated, "Do you know how come I know they don't? Because when I made the stink about people in Children & Youth not having a certification to take drug tests, all of a sudden you gotta go to the probation office to take drug tests. See, you think all black

people are dumb, but I'm a little more educated that you think I am." *H.T., Vol. 3, Pg. 633.*

- Father testified that from April of 2018 until March of 2020 when he began anger management, all while Minor Child was in foster care, he failed to participate in any services. *H.T., Vol. 3, Pg. 637.*
- Father says that he does not speak with foster mother during the exchange for visitation with Minor Child because he learned that in anger management class. *H.T., Vol. 3, Pg. 644.*
- In response to questions regarding whether his anger and aggression could have a negative impact on the Minor Child, Father testified, "anger and aggression in this world sometimes is necessary. *H.T., Vol. 3, Pg. 646.*
- Father testified that he does not think the Minor Child's bond with his foster parents is irrelevant. *H.T., Vol.3, Pg. 652.* Further testifying that, "if the bond with the [foster parents] is not important, the one with his siblings is. And I will make sure they stay together." *H.T., Vol. 3, Pg. 653.*
- Father acknowledged in his testimony taking Minor Child's sibling around the corner from Mother and Maternal Grandmother and disciplining him. *H.T., Vol. 3, Pg. 682.* Adding further that this action was taken by request of Mother and Maternal Grandmother. *Id.*
- Father clarified that the discipline involved a spanking performed with Father's hand, following which the child cried. *H.T., Vol. 3, Pg. 683.*
- Father acknowledged that, when Minor Child was born, he lived with a person who was an accused "predator," but further testified that charges against said individual were "unfounded." *H.T., Vol. 3, Pg. 684.*
- Father acknowledged that he also lived with Mother at the time of the birth of the Minor Child. *Id.* He further acknowledged that Mother's other two children had been removed from her care by CYS during this time period. *H.T., Vol. 3, Pg. 685.*

Carol Glass, Maternal Grandmother:

- Ms. Glass testified regarding her recollection of Father disciplining Minor Child's sibling. Ms. Glass testified that Father, "grabbed" up the child by the arm and "dragged him around like a column, like on the end of the wall." Ms. Glass testified that before Father got around the wall, "Father removed his belt and was hitting the child more than five (5) times. *H.T., Vol. 3, Pg. 706.* Ms. Glass testified that the child was screaming when this happened. *Id.*
- Ms. Glass acknowledged that she only heard and did not see the incident, but indicated, "it didn't sound like a hand." *Id.*
- Ms. Glass testified that she wanted to intervene during the incident, but she was concerned that after she left the house, Father would take it out on Mother. *H.T., Vol. 3, Pg. 710-711.*

- Ms. Glass testified that she observed injuries on Mother during a time that Mother was living with Father, but came to stay with Ms. Glass for a couple days. *H.T., Vol. 3, Pg. 717.*

Julianna Peterson, Foster Mother for Minor Child

- Ms. Peterson testified that she resides with her sister Ashley, the Minor Child and two other children (half-siblings of Minor Child). *H.T., Vol. 3, Pg. 720.*
- Ms. Peterson testified that she does a lot of the transportation for the Minor Child's visits with Father. *Id.*
- Ms. Peterson testified that she does not have a lot of communication with Father because he has been hostile to her. *Id.*
- When asked to provide examples of hostility, Ms. Peterson testified, "most recently, there was an incident where I was picking up [Minor Child] from a visit, and [Minor Child] started jumping up and down and saying 'mommy, mommy.' And he yelled at [Minor Child] and told him, 'that is not your mother.'" *H.T., Vol. 3, Pg. 721.* Ms. Peterson testified that the Minor Child looked "visibly upset" and "confused" because of hearing the statement. *Id.*
- Ms. Peterson described another incident where she was buckling Minor Child in the car and Father was talking to a Justice Works caseworker and using cuss words. *Id. and at 722-723.* Upon further questioning, Peterson indicated that Father was using the F-word. *Id.*
- Ms. Peterson testified that Minor Child gets "very upset" when he is going for a visit and she is not doing the transport. *H.T., Vol. 3, Pg. 724.*
- Ms. Peterson testified that, with the most recent visits, she was at school with Minor Child and he was "oddly aggressive, just, you know, doing a lot of yelling throwing toys." *Id.* Peterson continued that when she asked Minor Child what was going on, he "wrapped his arms around my neck and he said, 'I don't want to see dad.'" *Id.*
- Ms. Peterson testified that Minor Child has a close relationship with his brother and sister that live with her. Id.
- Ms. Peterson testified that she does not believe Father would maintain a relationship between Minor Child and his siblings if Minor Child was reunited with Father. *H.T., Vol. 3, Pgs. 725-726.*
- In response to questioning regarding what type of care she provides for the Minor Child, Ms. Peterson testified that she provides "24/7 basic care, feeding, diaper changes, potty training. Teaching him his colors and numbers and loving him." *Id. at 727.*

Ashley Turney-Jackson, Mother of Minor Child:

- Ms. Turney-Jackson testified that the photographs offered by GAL Hathaway were photos of her with a black eye and the black eye on her body was perpetrated by Father. H.T., Vol. 3, Pgs. 741-742 and 747.

31

- Ms. Turney-Jackson testified that another photograph with an elbow bruise was a photograph of her that was perpetrated by Father. *H.T., Vol.3, Pg. 747.*
- Ms. Turney-Jackson testified that another photograph with a bruise on a leg, was a photograph of her of an injury that was perpetrated by Father. *H.T., Vol. 3, Pg. 748.*
- Ms. Turney-Jackson testified that two (2) other photographs of bruising on her leg and of bruising near her rib area represented her body, also caused by Father. *H.T., Vol. 3, Pgs. 749-750.*
- Ms. Turney-Jackson indicates that she was the victim of domestic violence by Father and further testified, "And here's the whole thing is when this occurred, I was still living with [Father] so of course, I'm not going to be, like, oh, yeah, he beats me up. Because at the end of the day. I still had to go home with this man." *H.T., Vol. 3, Pg. 751.*
- When asked her recollection of the incident involving Father's discipline of her other child described by Ms. Glass, Turney-Jackson testified as follows: "So [Father] snatched my son up in his arm and drug him into the kitchen in front of my mother and me, and took his belt off and started beating the hell out of [the child] in the kitchen." *H.T., Vol. 3, Pg. 753.* Turney-Jackson continued, "my mother and myself were both in the living room. But we could hear the belt slapping against [the child's] rear end. *Id.*
- Ms. Turney-Jackson testified that she told Ms. Glass to say nothing because, "as soon as you leave, then, do you know what I mean? I'm basically going to get shit for it is what I told her." *Id.*
- Ms. Turney-Jackson testified that she was the victim of domestic violence at the hands of Father "more than ten, less than a hundred" times. *H.T., Vol. 3, Pgs. 754-755.*
- Ms. Turney-Jackson was questioned why she previously denied domestic violence to the Court and she testified: "See, what a lot of people don't understand is that if you're in a domestically violent situation, you'll do whatever you can to prevent that domestic violence. So I know I'm putting myself at risk, I'm absolutely fine with it, because I now live alone. But at the time, I was not going to sit in the courtroom and say, Oh, [Father] is domestically violent with me, this and that. Because at the end of the day, you didn't have to go home to him, I did. And I knew what I would be in for...Basically meaning that I knew that it would be another shit storm when I got home. Of course, I'm not going to sit there and be, like, Oh, yeah, he puts his hands on me. Because, you know, like I said, when you're a victim of abuse, you'll do anything to prevent that from further happening." *H.T., Vol. 3, Pgs. 754-755.*
- Ms. Turney-Jackson testified that both she and Father are "a mess" and "neither one of us, right now, are in any position to raise a child; especially one that is very vulnerable, you know, being the age that he is." *H.T., Vol. 3, Pg. 757.* Mother continued by saying that she "firmly believes" that Minor Child would benefit from staying with his foster parents and brother and sister. *Id.*
- Ms. Turney-Jackson testified that Minor Child calls foster mom, "mama, mommy, mum." *H.T., Vol. 3, Pg. 758.*
- Ms. Turney-Jackson testified that Father and she discussed continuing contact with Minor Child's siblings if Child was returned to Father. Turney-Jackson testified that "he said he didn't have a problem with [siblings] seeing [Minor Child]. However, when it

32

came to [foster mom], basically, to quote him directly, he said that, 'that white bitch would never see his child.'" *Id.*

- Ms. Turney-Jackson testified that she is relinquishing her rights to her children because she cares about them and thinks it would be selfish to put them in an unhealthy situation. *H.T., Vol. 3, Pg. 761.*

- Ms. Turney-Jackson testified that when she and Father were in Dependency Court in early fall of 2020 there was an incident were she and Father were arguing. Turney-Jackson testified that as Father sat at the table, he said, "I wish I had a gun, I would shoot your fucking head off right now." *H.T., Vol. 3, Pg. 765.*[10] Turney-Jackson testified at that time she requested that Father be drug tested because, "I felt like he was throwing me under the bus and constantly making me look like a bad guy. What I had said in one way or another is, not everybody in this courtroom's perfect. If you drug test him right now, I guarantee that he'll fail." *H.T., Vol. 3, pg. 766.* Turney-Jackson testified that she made the statement because she was doing drugs with him at the time and they were "both on cocaine." *Id.*

- Ms. Turney-Jackson testified that Father domestically abused her before and after the birth of Minor Child and during her pregnancy. *H.T., Vol. 3, Pg. 768.*

- When asked why she didn't report domestic violence at times in the Dependency Court hearing when she didn't live with Father, Ms. Turney-Jackson indicated at first that no one asked her about domestic violence, but when asked specifically regarding a hearing in November of 2019, Turney-Jackson indicated that she and Father were still sexually active at the time. *See: H.T., Vol. 3, Pgs. 769-775, generally*

- Ms. Turney-Jackson testified that she believes that Father truly loves his son. *H.T., Vol. 3, Pg. 789.*

- Ms. Turney-Jackson testified in confirmation of her request to voluntarily terminate her parental rights to Minor Child. *H.T., Vol. 3, Pgs. 824-828.*


Shellisa Chandler, daughter of Norma Welsh and cousin to Mother and Minor Child:

- Ms. Chandler testified that she has observed Father with Minor Child and the visits were going very well. *H.T., Vol. 3, Pg. 808.*

- Ms. Chandler indicated that the visit occurred with a relative that was also a caseworker for Father. *H.T., Vol. 3, Pg. 809.* Upon further questioning, Ms. Chandler indicated that she was not present for this visit, but identified the individual, a Patience Frazier, worked for Justice Works. *H.T., Vol. 3, Pgs. 812 and 816.*

---

[10] Following this exchange, the participant seats were modified in Court so that the Agency solicitor was placed between Father and Mother.

Having reviewed the extensive history of this case, an analysis of the general legal standards and application of each section alleged by the Agency will be examined.

## Review of Relevant Legal Standards and Application to Present Case

"In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so." *In re N.W.*, 859 A.2d 501, 506 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of the precise facts in issue." In Re C.M.S., 832 A.2d 457, 461-642 (Pa. Super. 2003).

The focus of a termination proceeding is the conduct of the parents with "adequate consideration" being given to the needs and welfare of the child. *Id.* at 508. Further, under the Adoption and Safe Families Act, "when a child is placed in foster care, after reasonable efforts have been made to establish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.**" *Id.* citing 42 U.S.C. §671, *et seq.* (Emphasis added).

Termination of parental rights is a bifurcated analysis. First, analysis is made under Section 2511(a) to determine if the parents' conduct merits termination of parental rights. The Court need only agree with *any one* subsection of § 2511(a), in addition to § 2511(b), in order to grant the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). If the analysis of Section (a) leads to an affirmative response, the court must then make an analysis under Section 2511(b), a determination of the needs and welfare of the child, under the standard of best interests, where one major inquiry is the bond between the parent and child and the effect of severing any bond. *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015). Absent a showing by clear and convincing evidence that a parent's rights should be terminated, no such termination may occur. *In re Adoption*

34

*of M.A.R.*, 591 A.2d 1133 (Pa. Super. 1991).

In the instant case before the Court, the Agency filed a Petition for Termination of Parental Rights under 23 Pa. C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and § 2511(b). Each statutory section will be evaluated, however, because it provides for the most comprehensive review, Sections 2511 (a)(5) and (8) will be reviewed first.

### Section 2511(a)(5)

Section 2511(a)(5) requires that the parents' rights be terminated if the child(ren) "have been removed from the care of the parents for a period of at least six months; the conditions which led to the removal or placement of the children continue to exist; the parents cannot or will not remedy those conditions within a reasonable period of time; the services or assistance reasonably available to the parents are not likely to remedy the conditions which led to the removal or placement of the children within a reasonable period of time; and termination of the parental rights would best serve the needs and welfare of the children."

### Section 2511(a)(8)

Pursuant to Section 2511(a)(8), parental rights may be terminated if a child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child. Because this Section contemplates a longer time frame of the Child's removal, there are only three (3) factors that must be evaluated in determining whether termination is appropriate under 2511(a)(8).

Both Section (a)(5) and (a)(8) require a finding regarding the amount of time the Minor Child has been removed from care of the parent by the Court. In the present matter, the Minor Child has been in placement since April 18, 2018, and remains in placement to date. At the time of the first directive of the Court for the Agency to file the Petition for Termination of Parental Rights, the Minor Child was removed from care nineteen (19) months. When the Agency filed the Petition for Termination, the Minor Child had been removed from parental

35

care twenty-seven and one half (27 ½) months. At the commencement of the TPR proceeding, Minor Child was out of care thirty-four (34) months. Additionally, with the exception of a few weeks where the Minor Child was in respite with intensive in-home services[11], the Child was never returned to Father's care. Minor Child has remained with his foster family, and his half-siblings, from birth until the present date. Accordingly, the first prong of 2511(a)(5), requiring Minor Child be out of care six (6) months and the first prong of 2511 (a)(8), requiring the Minor Child be out of care twelve (12) months has been established by clear, convincing and uncontroverted evidence.

The next requirement of both Section 2511(a)(5) and 2511 (a)(8) requires a finding that the conditions that led to the removal or placement of the child continue to exist. At the time of the initial adjudication, the Agency alleged that the Minor Child was without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional heath or morals. Continuing, as legally mandated, that a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including the use of alcohol or controlled substances. The Adjudication Order raises concerns with the home environment, including Father's protective capacity and parenting judgment. Emphasizing Father's awareness of Mother's involvement with the Agency and his relationship with Mother, prior to the Agency removal of her other children; Father's co-habitation with an indicated perpetrator; concerns with criminal histories of Mother and Father; and substance abuse in the home. As the case progressed through the Dependency proceedings, additional concerns were raised regarding the safety of the home due to allegations of domestic violence, substance abuse, and Father's behaviors.[12]

At the time of the hearing on the Petition for Termination of Parental Rights, concerns remained regarding the Minor Child having proper parental care or control, subsistence, education or other care or control necessary for his physical, mental or emotional health within Father's care and home. Specifically, questions of Minor Child's safety were raised over

---

[11] See testimony of Liz Knapp, summarized herein and contained in Hearing Transcript at Vol. 2, Pg. 315.
[12] At the time of adjudication, Mother was known to the Agency. Father had no known involvement with Agency.

conduct of Father that potentially placed the Minor Child's health, mental and emotional health, safety and welfare at risk. Additionally, because of Father's historical refusal and non-compliance with court orders and Agency requests, previously unsubstantiated concerns were raised during the hearing. Including concerns raised by testimony of Mother at the hearing on the TPR. More specifically, Mother's testified that she was the victim of domestic violence perpetrated by Father. *H.T., Vol. 3, Pgs. 747-755.* Mother also testified that during a Permanency Review Hearing, both she and Father were on Cocaine.[13] *H.T., Vol. 3, Pg. 766.*

As outlined above, the history of the Dependency case establishes the following:

- Father was ordered to obtain and maintain a safe and stable living arrangement. Although Father moved many times throughout the Dependency case and mentioned another anticipated move at the time of the TPR hearing, Father has obtained and maintained **structurally** safe and appropriate living conditions.[14] Nevertheless, the safety and stability of housing is also contingent upon the activities in and surrounding a household. Due to Father's refusal and/or non-completion of services, the Court is unable to establish that Father's home is safe from domestic violence and/or illegal drugs. This is bolstered by Father's criminal history, comments regarding prior violent acts, testimony regarding a history of domestic violence, including a previously dismissed but unfiled protection from abuse with paternal grandmother, questions regarding police reports involving domestic situations with Father's most recent and/or current paramour, and testimony regarding the questionable form of discipline of another Child by Father.[15]

- Father was ordered to participate in parenting education and follow through with all recommendations. Despite such Court Orders, Father did not complete parenting education.[16] The Agency caseworker supervisor testified that Father was referred to parenting education from April until July of 2018 and was re-referred for parent education

---

[13] Notably, although recalled for rebuttal testimony, Father never denied and/or clarified either allegation.
[14] See testimony of Ashley Blake contained herein and found in Hearing Transcript, Vol. 1, Pg. 246.
[15] See above testimony as follows: Testimony of Dr. Bernstein, contained at H.T., Vol. 1, Pg. 51, and 64; Blake testimony, contained at H.T., Vol. 1, Pg. 246; Peterson testimony, contained at H.T., Vol. 2, Pg. 432; Sutherland testimony, contained at H.T., Vol. 3, Pg. 508; Glass testimony, contained at H.T. Vol. 3, Pg. 706 and 717; Turney-Jackson testimony, contained at H.T., Vol. 3, Pgs. 7540755 and 765-766.
[16] See above testimony of Blake, contained at H.T., Vol. 1, Pg. 203. See also Father's acknowledgement of not completing parenting education. *Found at H.T., Vol. 3, Pg. 626.*

through Justice Works in July of 2018. *H.T., Vol. 1, Pg. 203.* Father refused to work with the providers and was discharged for noncompliance on December 4, 2018. As testified by the casework supervisor, Father consistently refused to participate in parenting education. *H.T., Vol. 1, Pg. 203.* Father has repeatedly acknowledged his refusal to participate with this service and points to his work with JusticeWorks and positive reports of the Agency. While this Court recognizes Father's improved reports, as provided by JusticeWorks with regard to Father's visitation, these evaluations and reports, in large part, only detail activity occurring after the Agency filing of the TPR petition with the Minor Child in placement in excess of two (2) years. In addition, the reports of the JusticeWorks providers must be balanced with the entire case history, including reports from other providers received during the same period.[17]

- Father was ordered to submit to random drug and alcohol screenings at the discretion of the Agency within 24 hours of the Agency requesting a test. The Casework Supervisor testified that Father, despite such Court Orders, refused and failed to participate in random drug and alcohol screenings. During the pendency of the case, Father participated in one (1) drug test, which was negative for all substances, but the test, conducted on April 19, 2018, was not random. Father was requested to participate in additional drug tests on August 3, 2018, September 17, 2018, and October 24, 2018, and Father refused all testing. *H.T., Vol. 1, Pg. 204.*[18] The Dependency Court record establishes that Father claimed he was drug tested by his employer. However, despite such assertion, when repeatedly asked to sign releases for the provision of such results, Father failed to do so. Father has never provided the Agency and/or this Court with these reported employer drug test results.[19] During an initial psychological evaluation with Dr. Eric Bernstein, Father provided a history of THC, cocaine, and acid use, but denied recent usage. *See report of Bernstein, April 23,*

---

[17] Although not explored by any party in detail, questions regarding the validity of the JusticeWorks reporting were amplified in the mind of this Court due to a reporting by one of Father's witnesses she observed a visit between Minor Child and Father which was being monitored by a JusticeWorks worker who was also a relative of Father's.

[18] See Father's acknowledgement that he was court ordered to drug test and refused to comply. H.T., Vol. 3, Pgs. 627-628.

[19] *See November 27, 2019 permanency review order.*

*2019 and May 7, 2019 at Pg. 9.* Due to Father's non-compliance, the Agency could not confirm his reports of no recent use of illegal substances. This concern of the Dependency petition never fully explored due to Father's refusal and non-compliance was compounded by the testimony of Mother at the TPR. Mother testified that she and Father were using cocaine together prior to a review hearing in the Fall of 2020.[20]

● Father was ordered to have frequent contact with the Agency. No specific evidence or testimony focused on this provision. However, a review of the summary of record above establishes many of the contacts between Father and Agency.

● Father was court ordered to sign all requested release of information forms. As discussed above, Father failed to provide a release of information for the Agency to obtain drug-testing results from Father's employer.

● Father was Court Ordered to enjoy supervised visitation with his Minor Child, initially three (3) times per week, with supervision by Blueprints and/or the Agency. Father initially engaged in sporadic visitation with the Minor Child. Visitation was modified in November of 2018, to take place on Saturdays and to accommodate Father's work schedule. Father then began more regular visits, although not a full exercise of his Court Ordered time, until he was prohibited from using the Blueprints visitation home after concerns were raised with his behaviors in the presence of the Minor Child. *See Permanency Review Order of November 12, 2019.* From July 2019 through June of 2020, Father failed to visit with the Minor Child, attributing the missed visitation to his work schedule. *Id.* After the Agency filed a request for Aggravated Circumstances, which was ultimately denied, Father resumed visits with the Minor Child.

● Father was ordered to complete an interactional with the Minor Child and a psychological evaluation through an appropriate provider. Father presented for a psychological evaluation with Dr. Eric Bernstein on April 23, 2019 and May 7, 2019 but presented as "guarded, defensive, and to an extent uncooperative" and "refused to comply with the completion of the psychological testing" for the evaluation. *See Bernstein Report*

---

[20] Turney-Jackson testified that she requested Father be drug tested at the permanency review hearing because she knew he would fail because they were doing drugs together and the time and both were on cocaine. H.T., Vol. 3, Pg. 766.

*of April 23, 2019 and May 7, 2019, Pg. 12.* See also, *See Permanency Review Order of November 12, 2019,* wherein Father is noted to have testified that he was aware of the recommendation for psychological testing and doubled down on his refusal to do the same. Father stating, "I refused to do it, I'm not a nut case." *Id.* Father also acknowledged his refusal in his testimony at the TPR hearing. *H.T., Vol. 3, Pg. 631.*

- Father was ordered to provide kinship and other support. Father was found to not have provided names of potential kinship placement providers for the Minor Child despite repeated requests. *See Permanency Review Order of November 12, 2019. See also, testimony of Caseworker, H.T., Vol.1, Pg. 221.*

- Father was ordered to complete anger management and/or conflict resolution counseling. Father did engage in anger management, albeit not when initially Court ordered. Despite such completion of service, Father's behaviors following completion are devoid of any support that Father internalized what he learned.[21] Although Father claims to be using what he learned in anger management and the JusticeCare Casework Supervisor, Lisa Sutherland, noted progress in Father, the record is ripe with examples of Father's outbursts, rants, erratic and disruptive behaviors and uncontrollable displays of frustration and anger, all following his completion of this service. As noted by Dr. Bernstein, Father has not internalized what he would have learned in anger management and "has consistently conveyed that he has never had an anger problem, that he's never been violent towards women. So his position of "innocence" to an extent precludes him from identifying as part of that group." *H.T., Vol. 1, Pg. 164.* Stating that he did not get the sense from Father that he made efforts to change because he saw no need to change. *Id.*

- In August of 2020, immediately prior to the filing of the TPR petition, Father was ordered to participate with Minor Child's medical appointments, Father attended one visit and attempted to attend one other but was unable through no fault of Father. Notably, this

---

[21] See Bernstein testimony summarized above and contained at H.T., Vol. 1, Pgs. 126-127 and 164; Blake testimony summarized above and contained at H.T., Vol. 1, Pgs. 204-207; Knapp testimony at H.T., Vol. 2, Pg. 341; Osowski testimony at H.T., Vol. 2, Pg. 268. Further, see Sutherland testimony summarized above, found at H.T., Vol. 3, Pg. 39-540, wherein Sutherland acknowledges that if Minor Child was in Father's care, without court ordered supervision, there would be no one present to de-escalate Father's anger.

is the only recorded attendance and attempted attendance of Father for medical appointments for Minor Child.[22]

A review of the record establishes that the conditions that led to placement in the present matter continue to exist and have persisted, if not aggravated, during the thirty-four (34) month history of the case, prior to the hearing on the Termination of Parental Rights. At Father's highest level of compliance, moderate, such assessment was based on Father "maintaining housing" and participating in anger management.[23] *See Permanency Review Order of June 20, 2020.* While Father visited consistently after a nearly yearlong hiatus and completed anger management on the eve of the hearing for Aggravated Circumstances, Father has failed to complete and/or accomplish any other goal necessary for reunification. In fact, Father completed absolutely no goals required for reunification during the requisite six (6) and twelve (12) month time frames contemplated under 2511(a)(5) and (a)(8). Although not contemplating actions under 2511(a)(5), "with respect to any petition filed pursuant to subsection (A)(1), (6), or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." *Adoption of CJP, 114 A.3d 1046 1053 (Pa. Super. 2015), citing TSM 71 A.3d at 267.*[24] Accordingly, this Court finds that the second prong under Sections 2511(a)(5) and 2511(a)(8) has been established by clear and convincing evidence. More specifically, the conditions that led to the removal or placement of the child continue to exist.

While additional analysis must be explored under 2511(a)(5), Section 2511(a)(8) requires no further inquiry before a needs and welfare analysis. *See: In the Interest of T.M.T., 64 A.3d 1119:*

---

[22] See summary of Blake testimony above, reference at *H.T., Vol. 1, Pg. 218.*

[23] Testimony at this review hearing established that Father moved quickly through the anger management program and Father asked to "double up on sessions." Illustrates type of stance and determination Father could have taken throughout the case history, but chose not to pursue.

[24] If constructive notice, Father would have been on notice at the time of the November 2019 Permanency Review Order, wherein the Court instructed the Agency to file a Petition for Termination. Father would also have had constructive notice of the Agency's intent to file a Petition for Termination during the December 2020 Review Hearing, wherein the Agency discussed it's delay due to Mother's marriage. However, it is uncontroverted that despite which "notice" time frame, Father failed to complete all court ordered services at the time of the filing of the TPR and at the time of the TPR hearing.

Section (A)(8) sets a 12 month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12 month period has been established, the Court must next determine whether the conditions that led to the child(ren)'s removal continue to exist despite good faith efforts of DHS supplied over a realistic time period. Termination under Section 2511(A)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability of the efficacy of DHS Services. *At 1125-1126, quoting In re K.Z.S., 946 A.2d 753,759 (Pa. Super. 2008).*

The analysis under Section 2511(a)(5) next requires the Court to determine if the parents cannot or will not remedy the conditions within a reasonable period of time. Here, as illustrated above, Father failed and refused to comply with most of the Court ordered services and recommendations. **Father's outright refusal is well documented of record and acknowledged by Father.**[25] Upon review of the circumstances in this case, this Court finds Father's delay in participation inexcusable. "A parent is required to exert a sincere and genuine effort to maintain a parent child relationship. The parent must use all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In Re C.M.S., 832 A.2d 457, 462 (Pa. Super. 2003).* Parental duty is an affirmative duty, which requires affirmative performance. "Parental rights are not preserved while a parent waits for a suitable or convenient time to perform parental duties while others provide the child with their immediate physical and emotional needs." *Id.* As stated by the Court *In Re V.E. and J.E.,* when children have been removed from the parental home and placed in foster care, the parent has "an affirmative duty to work toward the return of his children." *611 A.2d 1267, 1271-1272 (Pa. Super. 1992).* "At a minimum that affirmative duty requires the parent show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." *Id.*

---

[25] See summary of testimony herein, with references to Hearing Transcript as follows: Testimony of Dr. Bernstein, *H.T., Vol. 1, Pg. 28;* and Father's testimony *at H.T., Vol. 3, Pg. 626-628,* relating to parenting education and drug screening; *Pg. 631,* relating to psychological evaluation.

In review of Father's failure to comply with Court Ordered and Agency recommended services, the Court cannot ignore Father's claims regarding racism. More specifically, Father has alleged that his race has played a role in his treatment by both the Agency, caseworkers, service providers, evaluators, and the Court. Despite such broad claims, Father has never pointed to a specific incident of racially motivated behavior, racial animus, racially insensitivity or racial hostility. Although outlined above, it bears repeating... When asked about his claims during the TPR hearing, Father stated, amongst other comments, that when the CASA worker first met him, "she looked right down her nose at me. She gave me that look. I'll say that look. And that look I know, because I'm black. I know when somebody you could tell by their gestures towards you, when they don't like that interracial couple stuff." *H.T., Vol. 3, Pg. 600.* Father based his feelings on "a look." Although Father may have legitimately believed that he was discriminated against as a result of his race, or based on his race, plus an additional factor, no evidence, testimony and/or witness supported this theory, with the exception of Paternal Grandmother's reference to "vicious white women attacking her son" when she attended a hearing. While multiple witnesses testified regarding concerns with Father and Father's non-compliance and refusals, such testimony was corroborated, oftentimes through Father's own testimony. Nothing gives any indication that race played any factor in the actions and recommendations of the Agency and/or Court. In addition, it is important to note that a comprehensive review of the record establishes that Father is the only participant who ever injects race into the record and the only person with documented racially insensitive, derogatory, or diversity charged and/or bigoted comments.[26]

---

[26] See references, summarized herein and contained within the Hearing Transcript as noted: Blake testimony that Father stood "six inches" from her and screamed, cussed, yelled profanities and call them "racial sluts (H.T., Vol. 1, Pgs. 206-207); Huey testimony that she heard Father say, "I know exactly who said that shit. It's that effing N-word, the bald headed black guy. (H.T., Vol. 2, Pg. 285); Knapp testimony that Father came down the stairs "screaming and yelling, right close to our faces, about wanting to know why we were there; calling us names like white, effing C-word, honkies, and screamed the only reason CYS was involved in this was because of that dumb, effing, white, B-word." (H.T., Vol. 2, Pg. 306); Peterson testimony that Father called her "white dyke" and made reference to her as part of the "fat girls club." (H.T., Vol. 2, Pg. 449-450); Father's testimony, "I'm loud, but I'm naturally loud. I'm a big dude. But I would look like a fairy if I had a little squeaky voice." (H.T., Vol. 3, Pg. 602); Father's testimony that African-American caseworker was a "token," illustrating what he described as "three types of niggers." (H.T., Vol. 3, Pgs. 615-616); Turney-Jackson testimony when discussing the potential of Father fostering sibling visits if reunited with Minor Child, "he said that white bitch would never see his child." (H.T., Vol. 3, Pg. 758).

43

Services were offered to Father over a thirty-four (34) month period and Father failed and refused to comply. He did not resist barriers, but rather erected barriers. Accordingly, this Court finds that the Agency has established by clear and convincing evidence that despite efforts of the Agency, Father cannot or will not remedy those conditions that led to the removal and placement of Minor Child in a reasonable period of time.

Although discussed in detail above, this Court also finds that the services or assistance reasonably available to Father are not likely to remedy the conditions, which led to the removal or placement of the Minor Child, within a reasonable time. Here, we known that Father has failed and refused to comply with any services offered by the Agency, except for the visitation provision, the anger management provision and the evaluation by Dr. Bernstein. The services offered were to address specific concerns raised by the Agency. After an extended period of non-compliance, services were removed from later orders and replaced by other services. Father still, admittedly failed to comply or severely delayed his cooperation and participation. Father ultimately did the anger management on the eve of the Aggravated Circumstances hearing and renewed his interest in visits with Minor Child shortly after that time. But concerns were not alleviated. Father's behaviors continue and Father continues to require services and redirection with his visits.

Although he delayed for a period of nearly two (2) years in cooperating with services, Father completed anger management relatively quickly. However, despite such completion, the anger management appears to have limited impact on Father. Dr. Bernstein testified at the TPR hearing that, based on his observations, "Father has not internalized what he would have learned in anger management." H.T., Vol. 1, Pg. 164. In addition, the record is littered with references of Father engaging in behaviors inconsistent with having internalized or benefitted from the anger management. Had Father not waited nearly two (2) years to begin commencing services, the Agency and Court would have had an opportunity to evaluate the effectiveness of services in alleviating concerns and the potential need for additional and/or advanced services. Father's unwillingness to cooperate, erection of barriers to compliance, and stance of non-compliance prohibited this from happening in a reasonable time-period. In short, this Court finds that the services or assistance reasonably available to Father are not likely to remedy the

44

conditions, which led to the removal or placement of the Minor Child within a reasonable period of time.

Finally, this Court will evaluate the last element of Sections 2511(a)(5) and (a)(8), whether termination best serves the needs and welfare of the Minor Child.

Here, there is no doubt that Father loves his Child and the Child has grown to love his Father and now enjoys his time with Father.[27] Nevertheless, a review of the record as a whole establishes that this Child, as with all children, requires permanency, consistency, safety and stability and the Minor Child is unable to achieve this with Father. From birth to the present date, with the exception of a few weeks in respite several months after the filing of the TPR Petition, the Minor Child has resided with his foster family and half siblings. The Foster Mother attends to the Minor Child's daily needs, basic needs, medical needs, educational needs, and social needs. While Father delayed in taking actions to reunite with his Minor Child, the Child's bond and security grew within the home of his foster family, particularly with his siblings.

After a significant period, Father has been able to establish that he can provide for the basic needs of the Minor Child. In fact, there is no dispute in the record that, once Father resumed visits with the Child, he was able to feed, clothe, play and educate the child.[28] However, the majority of these interactions occurred following the filing of the TPR. In light of the history of the case, this Court evaluates these connections akin to a child's fondness of a teacher or babysitter or distant relative following a period of absence. When Dr. Bernstein conducted the interactional of the Minor Child and Father in the spring of 2019, the Minor Child was "crying at the end of the interactional evaluation with Father." *H.T., Vol. 1, Pg. 29.* Following the assessment, Father stopped visiting with the Minor Child for nearly a year. In comparison, in the fall of 2019, Dr. Bernstein conducted an interactional evaluation with the Minor Child and his caregivers and his half-siblings and noted how "Minor Child cried when his half-siblings left the office and "quickly recovered as soon as they returned." H.T., Vol. 1, pg.

---

[27] See testimony of Kendra Toseki, Father observed Minor Child saying, "Daddy, I love you." *H.T., Vol. 3, Pg. 492.* Toseki also testified she saw Father play with Minor Child and assist with his toys. *Id.*

[28] Knapp testimony summarized above and found in hearing transcript that she observed "In her few interactions with [Father] and [Child] good parenting skills, as far as going over letters, numbers, things like that nature. (H.T., Vol. 2, Pg. 314); Sutherland testimony that Father is good with Minor and she has no concerns with his parenting. (H.T., Vol. 3, Pgs. 507-508). Child

45

32. Dr. Bernstein testified that, "the measure of the bond of a relationship is more than just the observation of the interaction alone, but is reflected in the level of investment by the caregivers, their consistency to establish trust, the stability of the environment itself, and of course, the quality of care provided." *H.T., Vol. 1, pg. 32-33.* Considering this definition, this Court recognizes that while Father has engaged in basic parenting skills within his home, he has taken no other steps to develop and cultivate his relationship as a provider for the Minor Child's needs and welfare. Father has only engaged with the Child to a limited extent. He has failed to provide cards, gifts or notes,[29] to attend medical appointments for the Child outside of being Court ordered and failed to temper his anger and hostility to enable a quicker reunification. This conduct is compared with that of the foster family, wherein foster mother testified that she provides for the 24/7 care of Minor Child and has done so since his birth. Peterson testified she provides "24/7 basic care, feeding, diaper changes, potty training. Teaching him his colors and numbers and loving him." *H.T., Vol. 3, Pg. 727.*

Furthermore, this Court cannot emphasize enough the relationship of the Minor Child and his siblings when making a needs and welfare analysis. As summarized above, Dr. Bernstein testified that Minor Child had been raised with his siblings and **"embraces them in his day-to-day environment,"** noting that **"they are part of his world that he understands and experiences, and which he has come to accept as his family."** *H.T., Vol. 1, Pg. 47.* Bernstein later testified that **"the sibling bond is absolutely significant, and if that were to be compromised, it could have a negative impact on the Child in the short term and long term."** *H.T., Vol. 1, Pg. 174.* Even Father has acknowledged the significance of the Minor Child's bond with his siblings stating, "If the bond with his [foster parents] is not important, the one with his siblings is." H.T., Vol. 3, Pg. 653. Father has testified that, if reunified with Minor Child, he will take efforts to ensure sibling visits.[30] Despite Father's claims, this Court believes that the record and history of the case establish the opposite. Specifically focusing on the testimony of

---

[29] *Hearing Transcript, Vol. 2, Pgs. 433-434.*
[30] See Father's testimony, summarized above and contained in hearing transcript as referenced: "I will make sure they stay together." (H.T., Vol.3, Pg. 653); Father states he will do everything in his power to be sure the Minor Child visits with his siblings. (H.T., Vol. 3, Pg. 596); Father commending foster parents for raising the Minor Child and asserting that he would work with foster mother to enable Minor Child to visit siblings. (H.T., Vol. 3, Pg. 619-620).

Mother that when she and Father discussed continuing contact with siblings if the Minor Child was returned to Father, Father indicated no problem with the Child visiting but stated in reference to foster mom, "that white bitch will never see his child." H.T. Vol. 3, Pg. 758. Also looking to testimony of Julianna Peterson, foster mother, that during custody exchanges, Father rarely talks to her, despite her efforts to the contrary. As referenced earlier, Father acknowledged this response as what he learned in anger management. Evaluating testimony of paternal grandmother stating her son, "doesn't like [Minor Child's] foster mother and her sister. *H.T., Vol. 3, Pgs. 556-558.* Finally, evaluating Father's behaviors during a family group decision-making session in October 2020, convened specifically to address issues and concerns of sibling visitation[31] if reunification were to occur, where the meeting had to be stopped due to lack of progress because Father was upset. *H.T., Vol. 2, Pg. 302.*[32] As with many other points in this case, Father has chosen his own anger and need for displays of indignation over the best interest and needs of his child.

Dr. Bernstein opined that that foster parents meet the needs and welfare of Minor Child and that Father's parental rights should be terminated. *H.T., Vol. 1, Pg. 64 and 66-67.* Bernstein further testified that the Minor Child, "looks to his foster mom as his psychological parent that he looks to for everyday needs and to remove the child is tantamount to compromising and negatively impacting his identity and his world." H.T., Vol. 1, Pg. 174. This Court agrees and <u>finds that the needs and welfare of the Minor Child will be best served with the Termination of Father's parental rights.</u>

In short, the Court is aware that the Child, Minor Child Williams, has been in placement for an extended period of time – in excess of 34 months -- far in excess of the minimal six months

---

[31] Foster mother, Julianna Peterson, has adopted Child's siblings.

[32] Even when evaluating the potential of a Permanent Legal Custodianship, Dr. Bernstein found it not to be a viable goal stating, a PLC is appropriate where there is a "modicum of co-parenting communication and/or relationship between the providers of care and the parent in question, and a level of shared respect and openness." *H.T., Vol. 1. Pg. 126.* Bernstein continued, "I know you've made mention about [Father's] progress, there are areas in which I have not seen progress that gives me the impression that he's going to continue having outbursts of behavior. And he's never shown discretion in conveying his upset and frustrations in this child's presence. I have not seen progress [sic] in that respect. His personality is such that I can't help but question if he's going to continue having difficulties managing his frustration, as exemplified by reports I've received of shouting and profanity and threatening behavior and insults to others, and the blaming of others for his respective difficulties." *H.T., Vol. 1, Pgs. 126-127.*

expressly stated in the § 2511(a)(5) and the twelve (12) months contemplated in §2511(a)(8). The conditions leading to removal and placement and amplified during the pendency of the case continue to persist. Father, by his own conduct and lack thereof, is not likely to remedy the conditions that led to the removal or placement of the Child, despite reasonable efforts of the Agency. Father's refusal and failure to comply has left the Minor Child in placement with his Foster family virtually his entire life. Father's delays have allowed the Minor Child to develop safety and security within the home of the Foster parents and to rely on the consistency and bond established with his half-siblings. Therefore, **the Agency has established grounds for the termination of Father's parental rights under both Sections 2511(a)(5) and 2511(a)(8).**

As noted above, the Agency has filed a petition requesting termination of parental rights under Section 2511(1) and Section 2511(2) as well.

### Section 2511(a)(1)

Under § 2511(a)(1), the rights of a parent(s) may be terminated if it is proven by clear and convincing evidence that the "parents by conduct, continuing for a period of at least six months immediately preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." In support of its petition under § 2511(a)(1), the Agency argues that Father has "failed to perform parental duties."

To support its claim, the Agency asserts that the Child was adjudicated dependent on April 18, 2018, and placed in kinship care with the same family that adopted the Child's half-siblings. The Father had not visited with the Child for a period of eleven months; specifically, from July 27, 2019 through June 28, 2020. The Agency filed its petition for Involuntary Termination of Parental Rights on August 11, 2020.

Parental duties are difficult to define. It involves basic care of feeding and dressing a child, spending time with a child and helping a child to learn and grow educationally and

emotionally. *See: In Re C.M.S., 832 A.2d 457,461-462 (Pa. Super. 2003).* Our court have said, "these needs, physical and emotional, cannot be met by a merely passive interest in the development of the child." *Id. at 462.* Parental duty is an affirmative duty, which requires affirmative performance. Further, parental rights are not preserved while a parent waits for a suitable or more convenient time to perform parental duties while others provide a child with their immediate physical and emotional needs. *Id.*

The Agency filed for aggravated circumstances in March of 2020; and, on June 20, 2020, a finding of aggravated circumstances was denied as to the Father. However, this Court found that "had the aggravated circumstances hearing been held in March 2020, this court would have had no question as to the granting of aggravated circumstances ... Due to COVID-19 pandemic, and additional circumstances outside of the Agency and Court's control, Father was given more time and he engaged in anger management and finally visited with Minor Child."

Nevertheless, the fact remains that Father failed to visit for an extended period of time, failed to participate in Court ordered services to take action to reunify with his child, failed to provide gifts, cards and/or financial support for the Child, and failed to attend and/or even request information regarding Child's medical appointment until the month when the TPR petition was filed. See earlier discussion under Sections 2511(5) and 2511(8). However, once he re-established contact, Father has been consistent with his visits. As Father's time with the Child has grown, there is no doubt that Father loves the Minor Child and the Minor Child knows Father and loves him. However, the Minor Child also loves his Foster Family and his brother and sister with whom his has lived consistently since birth. Father's delay in stepping up with parental duties only served to solidify the Minor Child's comfort in the foster home.

Once evidence establishes a failure to perform parental duties, the Court is instructed to engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child; and (3) consideration of the effect of termination under §2511(b). *See In Re C.M.S. at 464-465.*

Addressing each of the above lines of inquiry, the Court will first look to Father's explanation for his conduct. With regard to his explanation, other than citing work conflicts, (that both the Court and Agency attempted to accommodate, without cooperation), Father has

offered no explanation for his failure to perform parental duties and his seeming desire to relinquish his parental claim.

Father failed and refused to visit with the Minor Child for a period of eleven (11) months and failed and refused to participate in Court ordered and Agency recommended services throughout the case. In March of 2020, Father finally began to engage and complete anger management. In June of 2020, Father resumed visits with the Minor Child and remained consistent up until the time of the TPR Hearing. Here, as in *In re: B., N.M.,* father initiated no action to assert his parental rights to the Child until he was faced with losing his legal status as the Father. *856 A.2d 847 (Pa. Super. 2004).* A court can consider actions of a parent to rehabilitate their parental status after the expiration of a period of time; however, this is not an unlimited exception. "It is well established that once the six month statutory period of abandonment has passed, mere renewal of interest and expression of the desire for return of a discarded child do not negate abandonment." *In re: E.S.M. 622 A.2d 388. (Pa. Super. 1993).* So the question becomes, were Father's acts in attending anger management and resuming a consistent schedule of visitation sufficient to rehabilitate his earlier abandonment of his child and parental duties.

This Court would suggest that it does not, but declines to further evaluate this question because an additional inquiry must first be completed. The language of Section 2511(a)(1) associates the time of abandonment around two words, "immediately preceding." In the present case, although the Court ordered the filing of the petition in November of 2020, the petition for termination of parental rights was not filed until August of 2020. At the time of the filing of the petition, Father had resumed visits and attended and completed anger management.

Because this Court finds that the Agency has established by clear and convincing evidence other grounds upon which termination of Father's parental rights, the Court declines to evaluate whether Father's post-abandonment contact is sufficient to offset or negate a finding of Father having a settled purpose of relinquishing his parental claim and refusal to perform parental duties.

<u>Section 2511(a)(2)</u>

Under § 2511(a)(2), the rights of a parent(s) may be terminated if "the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parents."

This Court is well aware that "a parent who cannot or will not meet the irreducible minimum requirements set by the Juvenile Act *within a reasonable time following state intervention* may properly be considered 'unfit,' and may properly have parental rights terminated." *In re: J.W., A.W., V.W., and J.W.*, 578 A.2d 952, 958, (Pa. Super. 1990).

Here, the Agency was granted emergency custody of the Child on April 6, 2018 because of ongoing concerns with the parents' inability to care and protective capacity for the Minor Child. Services were Court ordered to alleviate concerns, (as discussed more fully above), and Father refused and/or failed to cooperate. Father's refusal to cooperate with the Agency, oftentimes fueled by his anger and upset with their involvement, has left the Minor Child in placement his entire life. Father has noted on many occasions that the Court ordered services and requests were for "bad parents" and he has not be shown to be a "bad parent." *See H.T., Vol. 3, Pg. 630.* Under Section 2511(a)(2), grounds for termination due to parental incapacity that cannot be remedied, "are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In Re: Adoption of K.J.*, 936 A.2d 1128, 1132 (Pa. Super. 2007). Failure of a parent to remedy the conditions within a reasonable period of time provides clear and convincing evidence that termination of parental rights of the parent(s) should occur. *In re: Adoption of B.J.R.*, 297 Pa. Super. 11, 15, 17, 579 A.2d 906, 909, 913 (1990); *In re: Adoption of M.A.R.*, 405 Pa. Super. 131, 191 A.2d 1133 (1991).

A parent is required to make concerted, diligent efforts towards the reasonable prompt assumption of full parental responsibilities. "A parent's vow to cooperate, and nothing more, after a long period of uncooperativeness regarding the necessity of or availability of services,

may properly be rejected as untimely and disingenuous. " *In re: A.L.D.*, 797 A.2d 326 (Pa. Super. 2002). Here, Father displayed opposition and indignation for what was happening to "him" as opposed to taking affirmative actions to do what was best for the Minor Child and his reunification. A parent must "exhibit reasonable firmness in attempting to overcome barriers.... He must affirmatively demonstrate love, protection and concern for the child." *In. Re: E.S.M., 622 A.2d 388, 392 (Pa. Super. 1993).* The action of Father showing his upset and anger overshadowed his interest in taking steps to get his child back into his care. Father has been more interested in making his point, showing he is right and chastising others for any suggestion to the contrary than affirmatively acting in the best interest of his child.

This Court has set forth in detail the number of Court ordered services and Father's response in the analysis under §2511(a)(5) and (a)(8) above and incorporates the same analysis here, noting, Father's continued refusal and failure to complete services. Although Father began engaging in "a service" and finally visited the Minor Child, Father remained non-compliant; including on July 31, 2020, wherein Father presented himself for an updated psychological evaluation as Court ordered, but refused to participate to allow the doctor to make recommendations to the Court

The evidence adduced during the hearings has established that the Father has continually and repeatedly taken action and/or refused actions that have caused the Minor Child to be without essential parental care, control or subsistence necessary for his physical and mental well-being. This Court further finds that Father has failed to remedy the conditions and causes, which led to the Child's placement outside of the parental home. The testimony provided during the hearings confirms that, notwithstanding all efforts to ensure reunification, Father has failed to display the level of commitment and understanding necessary to fulfill the parental duties needed by the Minor Child. Accordingly, this Court finds that that Agency has established clear and convincing evidence that Father's parental rights should be terminated under Section 2511(a)(2).

52

## Section 2511(b)

Title 23 Pa.C.S. § 2511(b) is the second step in the analysis of considering termination of parental rights. As such, § 2511(b) requires "the court in terminating the rights of a parent [to] give primary consideration to the developmental, physical and emotional needs and welfare of the child." While Section 2511(a) requires a focus on the parent when terminating parental rights, § 2511(b) requires a focus on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) *(en banc)*. Section 2511(b) has been interpreted by the Courts to be a "best interests" and "bond" analysis, although bond is not explicitly defined. *See In Re: G.M.S., 193 A.3d 395, 401 (Pa. Super. 2018)*.

Bond is not the only consideration to be evaluated in this analysis. As stated by the Court in *G.M.S.*, case law "provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis." *Id*. The Court continues,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many facts to be considered by the court when determining what is in the best interest of the child." *Id*. "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security and stability that the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id., quoting In re Adoption of C.D.R., 111 A.3d 1212 (Pa. Super. 2015)*.

Because bond is considered a "major aspect" of a Section 2511(b) analysis, this Court will first evaluate bond in the facts of this case. As noted above, there is no question that Father loves the Minor Child and the Minor Child has learned to love and enjoy time with Father. Many professionals involved with this case have described the "bond" that has developed between Father and Child during the post-abandonment contact period, as described herein. The question becomes whether the bond is sufficient to rise to the level contemplated under Section 2511(b) and whether severing of any such bonds outweighs other considerations and factors to be evaluated in the analysis of Section 2511(b). As discussed by the Court in In *the Interest of T.M.T.*:

53

"Father testified that he loves his children very much and Ms. Convey testified on cross-examination that the children were excited to see him. Father's words, however, are not enough, as we have held that a parent's own feelings of love and affection for a child alone do not prevent termination of parental rights. Moreover, while the children may enjoy eating snacks and having fun time during a supervised visit, this does not rise to the level of a parent child bond."

64 A.3d 1119, 1128 (Pa. Super. 2013).

Admittedly, here, the Minor Child has been observed saying, "Daddy, I love you." *See testimony of Kendra Toseki at H.T., Vol. 3, Pg. 492.* In addition, testimony was received discussing observations of the Minor child climbing into his Father's lap and asking Father to play with him. See testimony of Sutherland at *H.T., Vol 3, Pg. 512-513.* Even Dr. Bernstein acknowledges that Minor Child and father have an existing bond, stating, the "Child recognizes him and enjoys Father's company when he isn't working." *H.T., Vol. 1, Pg. 65.* Bernstein noted this bond was greater than observed in his earlier interactional and attributed it to more time with Father. *H.T., Vol. 1, Pgs. 118-119.* Accordingly, this Court finds that there is an existing bond between Father and the Minor Child and must look to whether preservation of this bond best serves the needs and welfare of the Minor Child.

This Court next turns to the other factors to be evaluated under Section 2511(b). More specifically, the Court will evaluate the safety needs of the child and other intangibles such as love, comfort, security, stability, and the continuity of relationships. As stated, it is undisputed that the Minor Child loves Father and is now comfortable with visits in his home; however, the Minor Child also loves his foster family, which includes his half-siblings with whom he has lived his entire life. This must be compared to his relationship with Father, which was only re-kindled, after Father resumed visits with the Minor Child and began engagement with Court ordered services. While this Court never wishes to compare the quality of a foster family versus the quality of a birth parent as a measure of best interests alone, when considering the factors of love, comfort, security, stability and continuity of relationships for a best interest determination, given the history of this case, this evaluation is inevitable. While Father was non-compliant with Court Orders and choosing anger, upset and uncooperativeness over visits with the Minor Child, the child was developing his stability and consistency within his foster

54

home. Dr. Bernstein has testified that the Minor Child looks to his foster mother and his siblings for his primary sense of love, safety and security. Surprisingly, Father's testimony suggests that he does not even recognize this impact. When Father was asked if he recognized that the year that he refused services his child was developing a bond with the foster family, Father testified:

> That doesn't matter, it doesn't matter how long my child is in foster care okay? They signed up to be foster parents. They know that any day, that child can be taken away from that home. The bond that is formed between a foster parent and a child does not matter. That is irrelevant."

*H.T., Vol. 3, Pg. 629.* This Court noted in a Dependency proceeding and reiterates now, Father fails to take into account the impact on the Minor Child of bonds formed within his foster home that only strengthened and deepened during Father's absence and defiance. Father views the proceedings as a competition between himself and foster mother as opposed to considering the impacts and best welfare of the Minor Child's physical and mental needs for consistency, safety, security, and permanence. As testified by Dr. Bernstein:

> [F]or younger children, especially nonverbal children who are in the minds of development of their brain and development in all respects, really, having a sense of connection and constant and predictable access to the parents is paramount for them to be able to make a healthy connection. Where there's inconsistency or unpredictability or sporadic contact, it compromises the quality of that bond. That is, the child comes to accept that this person is not reliable, or somebody upon whom they can depend for their needs, and they become a less significant factor in their lives.

*H.T., Vol. 1, Pg. 34.*

Bernstein testifying further that, although Father has made some positive progress, "the Minor Child looks to his foster mom as his psychological parent that he looks to for everyday needs and to remove the child is tantamount to impacting his identity and his world." *H.T., Vol. 1, Pg. 118-119.* Bernstein testified that the Minor Child has been raised with his siblings and "embraces them in his day-to-day environment, they are part of his world that he understands and experiences, and which he has come to accept as his family.[33] H.T., Vol. 1, Pg. 47. Even

---

[33] See also, Testimony of Julianna Peterson regarding Father yelling at the Minor Child for calling her "mummy" and further description of Child's confusion. *H.T., Vol. 2, Pg. 431.* See also further testimony that Minor Child has developed a relationship with Petersons parents and calls them grandma and grandpa. *H.T., Vol. 2, Pg. 433-434.*

considering this connection, Dr. Bernstein recognized that the Minor Child would have some impact from a termination of Father's rights, but opined that the Minor Child's best interests would be best served. Bernstein opined that terminating Father's rights will have some measure of negative effect upon Minor Child, and he will experience separation or loss, but the loss is not "so overwhelming that it can't otherwise be compensated for, should the court move forward and support the adoption process." H.T., Vol. 1, Pg. 65.

Termination as in the best interests of the developmental, physical and emotion needs and welfare of the Minor Child is further buttressed when evaluating continued concerns regarding Father's protective capacity, drug use and domestic violence in and around Father's home and concerns with the Minor Child's mental and emotional development and security with Father's continuing behaviors. Considering Father's response to services historically, this Court is left to conclude these concerns cannot be rectified to ensure the safety and security of the Minor Child in his care within a reasonable period of time. Accordingly, as noted by the Court In Re: Adoption of C.J.P., 11 A.3d 1046, 1054-1055 (Pa. Super. 80), even if Father and Child are bonded, the bond is outweighed by Father's inability to remedy the causes of Child's placement and by Child's need for permanence and stability. Wherein the Court quoted In re Adoption of R.J.S., 901 A.2d 502,513 (Pa. Super. 2006), stating, "The court cannot and will not subordinate indefinitely a child's need for performance and stability to a parent's claims of progress and hope for the future."

In this case, the Agency position is that termination of Father's parental rights is in the best interest of the Minor Child. H.T., Vol. 1, Pg. 219. CASA has advocated for adoption of the Minor Child in the foster family.[34] Mother of Minor Child supports the Minor Child staying with the foster parents. Mother testified she, "firmly believes" that Minor Child would benefit from staying with his foster parents and brother and sister. H.T., Bol. 3, Pg. 758. Dr. Bernstein testified that in his professional opinion, termination of Father's parental rights would best serve the needs and welfare of the Minor Child. H.T., Vol. 1, Pg. 66-67. Based on the foregoing,

---

[34] See testimony of Vivian Osowski, indicating that she has advocated for the Minor Child to be with the foster family because, "for a large portion of the Minor Child's life, father was not involved at all" and Father only recently became involved after going months without seeing the Child.

this Court agrees and finds that, pursuant to Section 2511(b), the needs and welfare of the Minor Child are best served with the termination of Father's parental rights.

This Court finding that the Agency has established by clear and convincing evidence grounds for the termination of Father's parental rights under 23 Pa. C.S. §2511(a)(2), (a)(5), (a)(8) and §2511(b), it is hereby ORDERED, ADJUDGED and DECREED, that the parental rights of Father, ERIC L. WILLIAMS, SR., to the above-named Minor Child are hereby terminated forever. Having accepted the modified petition and Voluntary Termination submitted by Mother as knowingly, willingly and voluntarily made, it is further ORDERED, ADJUDGED, and DECREED that the Voluntary Termination of Parental Rights by Mother is accepted and Mother's rights to the above-named Minor Child are hereby terminated forever. Legal and Physical custody of the Minor Child will remain with the Washington County Children and Youth Social Service Agency and the Agency may proceed with adoption.

BY THE COURT:

_____ J.

Cc: Barbara Tennille Newsome Boyles, Esq.
MariAnn Hathaway, Esq.
Jennifer Sinclair, Esq.
Mark Adams, Esq.